BRENT L. FINE, APPELLANT, V. NAOMI L. FINE,
NOW KNOWN AS NAOMI L. COREY, APPELLEE.

626 N.W. 2d 526

Filed May 25, 2001.   No. S-99-1277.

Sally A. Rasmussen, of Mousel, Garner & Rasmussen, for appellant.

Terry L. Rogers, of Terry L. Rogers Law Firm, P.C., and DeAnn Stover, of Koenig & Stover, for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

STEPHAN, J.

In a memorandum opinion filed November 28, 2000, the Nebraska Court of Appeals affirmed an order of the district court for Red Willow County modifying visitation rights which it had granted to Naomi L. Fine, now known as Naomi L. Corey, at the time of the dissolution of her marriage to Brent L. Fine. We granted Brent's petition for further review.

## BACKGROUND

The parties are the parents of two children, born on May 10, 1992, and August 22, 1993. In the decree of dissolution entered on March 1, 1995, the district court found that

> both parties are generally fit and proper to have the permanent care, custody and control of the parties' minor children. However, the [father] is more stable and can provide a stable and more suitable lifestyle for the children. The [mother] seems more intent at this time with her own needs and gratification. Therefore, custody of the minor children shall be placed with the [father], subject to reasonable rights of visitation in the [mother] as hereinafter ordered.

The unsupervised visitation rights awarded by the court included alternating weekends, alternating Wednesday nights, 6 weeks during the summer, and certain holidays.

On November 2, 1998, the father filed a petition for modification of the decree alleging a material change in circumstances pertinent to visitation. Specifically, the father alleged that the mother had not been able to provide a stable, healthy, or safe environment for the children during their visits with her, which at times had been sporadic; that the mother had exercised poor judgment pertaining to companions and living arrangements, placing the children's safety in jeopardy; and that there had been a deterioration in the mother's mental health since entry of the decree. The father further alleged that it would be in the best interests of the children for the mother's visits to be "restricted, supervised or terminated until [she] can demonstrate to the court that she is able to provide a stable, healthy and safe environment for the children during their visits with her."

At the hearing held on his petition for modification, the father testified that the children had resided with him in McCook, Nebraska, at all times subsequent to the dissolution of the marriage. He stated that the mother had no contact with the children from February through November 1996, during which time she was remarried and lived in Oklahoma with her husband. That marriage was of brief duration and ended because of significant physical abuse suffered by the mother. Beginning in November 1996, the mother lived on a farm near Danbury, Nebraska, with a man to whom she was engaged at the time of the hearing.

From late 1996 until September 1998, the mother exercised her weekend visitation rights as set forth in the decree, transporting the children to the farm where she resided and then returning them to the father's home in McCook. In September, the Red Willow County Sheriff notified the father that the mother had been hospitalized in Lincoln following a suicide attempt and had reported to authorities that a man she identified as her "boyfriend" had been physically abusive toward her and that she suspected him of molesting his own daughters because of photographs he had taken of them.

Upon receipt of this information, the father insisted that all future visits by the mother be exercised in his home under his supervision, and the mother complied with this request. The father testified that he was uncomfortable with this arrangement and would prefer not to personally supervise these visits. He also testified that it would be inappropriate for any member of the mother's family with whom he was acquainted to supervise the visits. He indicated that a professional visitation supervisor from the "McCook Exceptional Families Resource Center" would be acceptable to him.

The record reflects that following the dissolution of the marriage in 1995, the mother's life was marked by repeated incidents of domestic violence. In March 1995, she contacted the McCook Police Department to report that a man identified as "Marion Croney, Jr." had assaulted another man in her home and had struck her. Croney was arrested and charged with several criminal offenses. Police reports indicate that upon Croney's release from custody, he was living with the mother. In September, the mother reported to police that Croney had harassed, assaulted, and attempted to choke her. In October, the mother was involved in a fight with two women whom she heard discussing Croney outside a bar. During this altercation, she was rendered unconscious after being struck in the head by a 12-pack of beer bottles. Four months later, she married Croney and moved to Oklahoma with him. The mother testified that she left Croney because of his repeated physical abuse which included kicking and choking her and the infliction of a "blowout fracture" of her left eye. Although the mother testified that she had

never been physically abused by her current fiance, she has made contradictory statements to law enforcement authorities.

There is also evidence that the mother has struggled with mental illness and substance abuse subsequent to the dissolution. On April 13, 1995, she was taken to a McCook hospital by ambulance because of a possible overdose while her children were present in her home. Records from her hospitalization at the Hastings Regional Center from January 27 to February 11, 1998, reflect that she admitted having suicidal tendencies and had tried to commit suicide three times since December 1997, twice by slashing her wrists and once by holding a gun to her head. In December 1997, while her children were visiting at her home, she cut one of her wrists with a butter knife following an argument with her fiance. According to medical records, the mother described growing up in an abusive home and stated that her own mother was in denial and was a hypocrite. She further stated that her biggest problem with relationships is that she "picks abusive men."

There is also evidence that the mother has a history of abusing alcohol and prescription drugs. She suffers from panic attacks, anxiety, and a bipolar disorder which are all treated by various medications. The mother's physician testified during the 1999 evidentiary hearing that the mother's bipolar disorder is currently "controlled" but not "well-controlled" by medication, meaning that she is "minimally" functional. The physician further testified that the mother's anxiety and panic disorder were not currently controlled by medication and that the mother can therefore expect to experience symptoms such as headache, rapid heart rate, sweating, and a feeling of doom. The physician testified that such symptoms would impact the mother's ability to care for her children.

The record includes seven color photographs taken by the mother's fiance depicting his own adolescent daughters either nude or wearing skimpy bathing suits. The mother confirmed that she turned these photographs over to Child Protective Services in September 1998 as evidence of possible sexual molestation. The mother testified that the photographs bothered her and that she would not wish to have photographs of that nature taken of her daughter. The father testified that he considered the photographs

inappropriate and would disapprove of such photographs being taken of his daughter. The mother's fiance testified that he frequently takes pictures of family members during family gatherings and that the photographs in question were innocent in nature. No criminal charges were filed based upon the photographs, but they were retained by the sheriff as "evidence."

The children's maternal grandmother, who lives on a farm near McCook, testified briefly. She stated that she had observed the mother with the children on several occasions during the period from 1995 to 1997. She did not believe that the mother's ability to care for the children was seriously impaired and knew of no incidents in which the children were harmed or put in serious danger of harm while they were visiting their mother.

Following trial, the district court ordered that the mother's visits with the children be supervised for so long as she lived with her current fiance. In ordering supervised visitation, the district court reasoned that while there was ample evidence regarding the mother's instability, poor mental health, and problems with addiction, there was no evidence that those problems had any effect on the children. However, the district court took a different view with respect to the photographs taken by the mother's fiance, stating that they

provide concern for the court and evidence of at least poor judgment on the part of the [mother's] boyfriend, and at worst, may show some sexual problems for [the mother's] boyfriend. These concerns convince the court that supervised visitation must be ordered until such time as [the mother] no longer resides with the boyfriend, or [the mother] furnishes evidence by way of testing and evaluation regarding his sexual preferences.

The district court ordered, sua sponte, that the mother's visits with the children be supervised by the maternal grandmother.

On August 27, 1999, the father filed a motion for new trial, which was overruled. He then perfected this appeal.

The Court of Appeals affirmed the judgment of the district court in a memorandum opinion filed on November 28, 2000. It determined that the district court properly ordered that the mother's visits be supervised based upon the conduct of her fiance and dismissed the father's argument that the district court

erred in not also requiring supervision on the basis of the mother's conduct, reasoning that the father "misunderstands" the district court to require a showing of actual harm to the children before visitation could be restricted. The Court of Appeals concurred with the district court's finding that the record revealed only one instance when Naomi's "bad behavior" occurred in front of her children. Finally, the Court of Appeals held that although the district court might "ideally" have held a hearing on the propriety of the maternal grandmother serving as visitation supervisor, the failure to do so was not an abuse of discretion due to evidence in the record that the mother had visited with the children at the grandmother's home in the past.

We granted the father's petition for further review.

## ASSIGNMENTS OF ERROR

The father asserts in his petition for further review, restated, that the Court of Appeals erred in affirming the trial court's visitation order because it did not protect the children from the mother's own behavior and in affirming the district court's sua sponte appointment of the maternal grandmother to supervise the mother's visits.

## STANDARD OF REVIEW

Visitation rights established by a marital dissolution decree may be modified upon a showing of a material change of circumstances affecting the best interests of the children. See *Smith-Helstrom v. Yonker*, 253 Neb. 189, 569 N.W.2d 243 (1997). Such modification is initially entrusted to the discretion of the district court, whose decision is reviewed de novo on the record and will normally be affirmed absent an abuse of discretion. *Poll v. Poll*, 256 Neb. 46, 588 N.W.2d 583 (1999). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Weiss v. Weiss*, 260 Neb. 1015, 620 N.W.2d 744 (2001).

## ANALYSIS

Visitation relates to continuing and fostering the normal parental relationship of the noncustodial parent with the minor children of a marriage which has been legally dissolved. *Heyne v.*

*Kucirek*, 203 Neb. 59, 277 N.W.2d 439 (1979). We agree with the trial court and the Court of Appeals that the mother's visitation rights should not be terminated as the result of circumstances occurring subsequent to the decree of dissolution. The record reflects that the mother and the children enjoy a loving relationship which is in the best interests of the children to preserve.

The best interests of the children are the primary and paramount considerations in determining and modifying visitation rights. See, Neb. Rev. Stat. § 42-364 (Reissue 1998); *Weinand v. Weinand*, 260 Neb. 146, 616 N.W.2d 1 (2000); *Hickenbottom v. Hickenbottom*, 239 Neb. 579, 477 N.W.2d 8 (1991); *Gerber v. Gerber*, 225 Neb. 611, 407 N.W.2d 497 (1987); *Nielsen v. Nielsen*, 217 Neb. 34, 348 N.W.2d 416 (1984); *Heyne, supra*. The best interests inquiry has its foundation in both statutory and case law. Section 42-364(1) and (2) direct courts to consider the best interests of the minor child in determining custody arrangements and time to be spent with each parent. Section 42-364(2) sets forth a nonexhaustive list of factors to be considered in determining the best interests of a child in this regard, including

[t]he relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing; . . . [t]he desires and wishes of the minor child if of an age of comprehension regardless of chronological age, when such desires and wishes are based on sound reasoning; . . . [t]he general health, welfare, and social behavior of the minor child; and . . . [c]redible evidence of abuse inflicted on any family or household member.

In addition to these statutory factors, we have explained that a court determines the nature and extent of visitation rights on a case-by-case basis and may consider many factors and circumstances in each individual case, such as the age and health of the child; the character of the noncustodial parent; the place where visitation rights will be exercised; the frequency and duration of visits; the emotional relationship between the visiting parent and the child; the likely effect of visitation on the child; the availability of the child for visitation; the likelihood of disrupting an established lifestyle otherwise beneficial to the child; and, when appropriate, the wishes of the child.

*Hickenbottom, supra*; *Gerber, supra*. In *Heyne, supra*, we identified "the need for a stable home environment free of unsettling influences" as one of the factors to be considered in determining reasonable visitation rights. 203 Neb. at 63, 277 N.W.2d at 441. Although limits on visitation are an extreme measure, they may be warranted where they are in the best interests of the children. *Poll v. Poll*, 256 Neb. 46, 588 N.W.2d 583 (1999).

Based upon our review of the record, we agree with the district court and Court of Appeals that modification of the mother's visitation rights to require that her visits be supervised is in the best interests of the children. The issues raised by the petition for further review involve two aspects of the supervision requirement: (1) its duration and (2) the person designated to provide supervision. The trial court determined that while there was a "large amount of evidence regarding the instability and mental and addiction problems of the [mother], there is virtually no evidence of any effect on the minor children." The court noted that it would be required to speculate in this regard in order to consider this evidence as bearing on the issue of modification of visitation rights. However, based upon its concern regarding the photographs taken by the mother's current fiance, the court required that visits be supervised until the mother no longer resided with the fiance or until the fiance furnished evidence "by way of testing and evaluation regarding his sexual preferences." There was no evidence that the fiance had taken similar photographs of the parties' children or harmed them in any way. However, the trial court apparently and appropriately determined that the conduct of the fiance, with whom the mother resided, posed a risk to the children's safety and contributed to an unsuitable environment for unsupervised visitation.

We conclude that the same reasoning should be applied to the considerable evidence of the mother's mental illness, substance abuse, and admitted attraction to abusive men. We do not cast fault or blame upon the mother, who has taken certain steps to confront and deal with these problems but has not yet overcome them. However, we cannot ignore the fact that the mother's living arrangements subsequent to the dissolution, including but not limited to the present one, have not provided a stable home environment free of unsettling influences which would permit

safe, unsupervised visitation. Of particular concern is the fact that the mother has engaged in self-destructive behavior on several occasions subsequent to the dissolution, at least once while the children were present at her home. In addition, the testimony of the mother's physician establishes that despite various changes in medication, the physician has not been able to achieve complete control of the mother's psychiatric illnesses. While there is no evidence that the mother would intentionally harm her children, there is considerable evidence that she is currently unable to protect them from harm during unsupervised visitation. Thus, while we find no error in ordering supervised visitation, we conclude that the district court did abuse its discretion in providing that the requirement of supervision would end when the mother no longer resided with her fiance or when the fiance furnished test results regarding his sexual preferences. For the reasons we have discussed, the mother's current living arrangement is only one of several factors which would place the children's safety at risk if visits were unsupervised. Accordingly, the district court's order should be modified to require that visits shall be supervised until the mother can make a satisfactory showing that she is able to provide a safe and stable environment for unsupervised visitation with her children consistent with their best interests.

We also find merit in the father's contention that the district court erred in designating the maternal grandmother as the person who would supervise the mother's visits with the children. Judicial determination of visitation rights consistent with the best interests of the children must be based upon evidence. See *Schulze v. Schulze*, 238 Neb. 81, 469 N.W.2d 139 (1991). Although the maternal grandmother testified that the children visited their mother in her presence "many times" from 1995 to 1997, she was not asked nor did she state whether she was willing and able to supervise visitation pursuant to a court order. The father testified that in his opinion, it would be inappropriate for any member of the mother's family to supervise visitation. The mother did not testify with respect to the suitability of the grandmother to supervise visitation. However, medical records from the mother's 1998 hospitalization at Hastings Regional Center reflect that the mother reported growing up in an abusive home,

described her own mother as "in denial and a hypocrite," and further stated that she had never had a good relationship with her stepfather with whom her mother resides. On this record, designation of the maternal grandmother to supervise visitation was an abuse of discretion. An evidentiary hearing should be conducted on remand to determine whether the maternal grandmother or some other person or agency should be designated to supervise the mother's visitation with the children. This hearing should also determine the manner in which any expense incurred for such supervision is to be allocated between the parties.

## CONCLUSION

For the reasons discussed herein, we conclude that the district court erred in defining the circumstances under which supervision would no longer be required and in appointing the maternal grandmother to supervise visitation in the absence of an adequate factual record establishing her willingness and suitability to perform this function. We therefore reverse the judgment of the Court of Appeals with directions to remand the cause to the district court for further proceedings consistent with this opinion.

REVERSED AND REMANDED WITH DIRECTIONS.