KIT DWIGHT WILLCOCK, APPELLANT, V.
DEBORAH LEE WILLCOCK, APPELLEE.

675 N.W.2d 721

Filed March 2, 2004.   No. A-03-600.

Chris A. Johnson, of Conway, Pauley & Johnson, P.C., for appellant.

Linda Caster Senff, of Powell & Senff, for appellee.

SIEVERS, INBODY, and MOORE, Judges.

MOORE, Judge.

## INTRODUCTION

Deborah Lee Willcock and Kit Dwight Willcock each had one of their minor children, both sons, in their physical custody prior to Deborah's filing an application to modify the parties' decree of dissolution. When the parties' elder son (who was in Kit's physical custody) reached the age of majority, Deborah filed this action, seeking to establish child support for the parties' younger son. Kit filed a cross-application for modification, seeking, among other things, additional summer visitation time with a corresponding reduction in his child support obligation during that period. The district court established an award of child support but did not modify Kit's summer visitation time. Kit appeals. For the reasons stated below, we affirm.

## BACKGROUND

When the parties' marriage was dissolved on March 26, 1993, custody of the parties' two minor sons was awarded to Kit, and on November 24, 1997, a modification decree transferred custody of both sons to Deborah. On October 28, 1998, the court entered an order awarding the parties joint legal custody of their sons but placing physical custody of the elder son with Kit and physical custody of the younger son with Deborah. At the time of the 1998 modification, the court did not order child support, due to the split physical custody arrangement. On October 31, 2002, Deborah filed an application to further modify the parties' decree of dissolution. In the application, Deborah alleged that a

material change of circumstances had occurred since the entry of the 1998 modification order, in that the parties' elder son had turned 19 on September 25, 2002. Deborah sought an order requiring Kit to pay child support beginning October 1 of that year for the parties' younger, still minor son.

Kit filed an answer and cross-application for modification of the decree. In his cross-application, Kit asserted that he should be awarded the income tax dependency exemption for the parties' minor son each year. Kit requested that Deborah be ordered to provide health insurance for the minor son, as well as to pay the first $1,200 of nonreimbursed medical expenses incurred for the minor son's benefit. Kit further requested summer visitation with the minor son for the entire months of June and July each year and an 80-percent abatement of his child support obligation during those 2 months.

The modification hearing was held on March 27, 2003. At the hearing, Kit testified that he farms approximately 700 acres owned by his father. About half of the farm ground is planted in corn; the rest is planted in alfalfa or dedicated to pasture. Kit and his father also raise cattle. Kit pays 60 percent of the expenses for the farming operation and retains 60 percent of the profits.

Kit's income tax returns from 1998 through 2002 were received into evidence. Kit's tax returns reveal the following:

| Year | Net Farm Profit | Depreciation | Wages |
|------|----------------|--------------|-------|
| 1998 | $16,467 | $1,975 | $6,600 |
| 1999 | 14,336 | 2,191 | 0 |
| 2000 | 25,907 | 2,053 | 0 |
| 2001 | 11,351 | 4,557 | 0 |
| 2002 | 4,691 | 2,076 | 0 |

Prior to 1994 or 1995, Kit earned a wage from his father's farming operation, as indicated above. In 1994 or 1995, Kit began renting his father's farm ground, and Kit and his father began splitting profits and expenses as described above.

Kit presented testimony from Cindi Heiden, the individual who prepared his 1999 through 2002 tax returns. Heiden, the franchise owner of the York, Nebraska, H&R Block office, indicated that she also had access to the materials used to prepare Kit's 1998 tax return, as that return had been prepared by the former owner of the York H&R Block office. Heiden testified that

she had been asked to prepare "straight line depreciation" on the items listed on the depreciation schedules of Kit's tax returns. Heiden testified that the straight line depreciation that was available and taken by Kit for 2002 was $1,418.90, for 2001 was $1,275.34, for 2000 was $1,254.75, for 1999 was $1,254.75, and for 1998 was $1,034.60. Taking Kit's net farm profit and any wages earned for each year from 1998 through 2002, adding back in the total depreciation shown on schedule F of his tax returns, and then deducting the straight line depreciation, Kit had earnings of $24,007.40 in 1998, $15,272.25 in 1999, $26,705.25 in 2000, $14,632.66 in 2001, and $5,348.10 in 2002.

Kit testified concerning the causes of his drop in farm income over the 2 years preceding the modification hearing. Kit testified that the market price for corn, his main crop, had dropped from $2.50 per bushel to around $1.40 and then recovered to approximately $2.20. Kit testified further that the recent drought conditions have substantially affected his farming operation. Specifically, Kit testified that the weather in 2002 caused the dryland corn to burn up, reduced the number of alfalfa cuttings from approximately four to two, and caused the pasture to be "short." Kit also indicated that government payments have been reduced in recent years. Kit irrigates a little over one-third of his corn crop, and he indicated that the expense of irrigation had increased during the drought period. Kit testified that his income has fluctuated since he began farming with his father on a cooperative basis approximately 8 years prior to the modification hearing. Kit further testified that such fluctuation is typical of farming income.

At the time of the hearing, Deborah worked full time at Cornerstone Bank in Aurora, Nebraska, earning $8 an hour. Deborah also had several part-time jobs from which she received several hundred dollars of additional income per month. Deborah submitted copies of the 2001 and 2002 joint tax returns for herself and her new husband. With regard to health insurance, Deborah testified that Kit had a policy on their minor son as part of his health plan and that her new husband carries the parties' minor son on his health insurance family plan at no extra cost. Deborah did not object to providing insurance for the parties' minor son as long as nonreimbursed expenses were split between her and Kit.

Kit submitted a proposed child support calculation, averaging his 2001 and 2002 income. Deborah submitted a proposed child support calculation, utilizing a 5-year average to establish Kit's annual income. Both Kit's and Deborah's calculations utilized rates of $8 per hour and 40 hours per week to calculate Deborah's annual income.

Kit's visitation schedule at the time of the modification hearing consisted of every other weekend, every other holiday, and two different 3-week sessions in the summer. The parties' minor son was 16 years old at the time of the hearing, and he had been employed in the past as a part-time telemarketer. Deborah testified that the parties' minor son planned to continue part-time summer employment following the school track season. Deborah asked the court to continue the summer visitation schedule of two separate 3-week sessions, which she felt was in the minor son's best interests. Deborah admitted that Kit lives close to the town in which she resides and that if Kit's visitation request were granted, the parties' minor son could still commute to any part-time job without difficulty.

Kit testified that he was seeking summer visitation with the parties' minor son for the months of June and July, with Deborah having weekend visitation during that time. Kit also indicated that he would be willing to allow the minor son to "come and go to [Deborah's] house as he please[d]." Kit testified that he thought that such a visitation arrangement would be in the best interests of the minor son, because Kit wanted to "bond with him more and be — instead of a visitor . . . a dad to him." Kit testified that the current summer visitation plan was not conducive to establishing the kind of relationship with the minor son that he wished to have. Kit testified that his request was driven in part by the fact that the minor son was then 16 years old and would be "out on his own" in another 3 years. Kit believed that the proposed visitation schedule would not interfere significantly with Deborah's time with their minor son given Deborah's work schedule (full-time job, plus various evening part-time jobs).

As to his request for the income tax dependency exemption, Kit testified that if the court granted child support based upon the

calculations he submitted, he would not expect to receive the dependency exemption. Kit also testified, however, that he would like to be given the opportunity to purchase the dependency exemption from Deborah.

The district court entered an order on April 22, 2003, finding that a material change in circumstances had been shown such that Kit should be required to pay child support for the parties' minor son. The court found that Kit's income fluctuates considerably due to his involvement in agriculture and determined that an average of Kit's earnings for the 3 previous years was the most appropriate method to determine Kit's annual income for child support purposes. The court prepared a worksheet utilizing the income and depreciation figures submitted at trial and ordered Kit to pay child support of $262 per month effective November 1, 2002. Pursuant to paragraph O of the Nebraska Child Support Guidelines, the court ordered Kit to pay 46 percent of the minor son's nonreimbursed health care expenses after Deborah has paid the first $1,200. The court did not make any order regarding the provision of health insurance. With respect to Kit's request for increased visitation and a corresponding abatement in child support during such visitation time, the court found no change in circumstances to support such request.

Kit filed a motion for new trial which was denied by the court on May 8, 2003. Kit subsequently perfected his appeal to this court.

## ASSIGNMENTS OF ERROR

Kit asserts, restated, that the district court erred in (1) averaging his last 3 years of income in calculating his child support obligation and (2) not awarding him additional summer visitation time with a corresponding reduction in his child support obligation during the extended visitation period. Kit also asserts that the court erred in not addressing the dependency exemption issue. Kit does not argue this error in his brief on appeal, and accordingly, we do not address it. A claimed prejudicial error must not only be assigned, but must also be discussed in the brief of the asserting party, and an appellate court will not consider assignments of error which are not discussed in the brief. *Hass v. Neth*, 265 Neb. 321, 657 N.W.2d 11 (2003).

## STANDARD OF REVIEW

Modification of child support payments is entrusted to the trial court's discretion, and although, on appeal, the issue is reviewed de novo on the record, the decision of the trial court will be affirmed absent an abuse of discretion. *Gallner v. Hoffman,* 264 Neb. 995, 653 N.W.2d 838 (2002). The same standard applies to the modification of visitation rights. See *Fine v. Fine,* 261 Neb. 836, 626 N.W.2d 526 (2001). An abuse of discretion occurs when the trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or con-science, reason, and evidence. *Hartman v. Hartman,* 265 Neb. 515, 657 N.W.2d 646 (2003).

Interpretation of the Nebraska Child Support Guidelines presents a question of law, regarding which an appellate court is obligated to reach a conclusion independent of the determina-tion reached by the court below. *Gallner v. Hoffman, supra.*

## ANALYSIS

*Child Support.*

Kit asserts that the district court erred in averaging his last 3 years of income in calculating his child support obligation. The fifth footnote (footnote 5) to worksheet 1 of the Nebraska Child Support Guidelines states, "In the event of substantial fluctua-tions of annual earnings of either party during the immediate past 3 years, the income may be averaged to determine the per-cent contribution of each parent as shown in item 6. The calcu-lation of the average income shall be attached to this work-sheet." The district court relied on this language in calculating Kit's child support obligation.

Kit argues that the court erred in its interpretation of the above language and that it was not in the best interests of the par-ties' minor son to use income averaging in the present case. In support of his argument, Kit directs us to *Peter v. Peter,* 262 Neb. 1017, 637 N.W.2d 865 (2002), and *State on behalf of Hannon v. Rosenberg,* 11 Neb. App. 518, 654 N.W.2d 752 (2002). In *Peter v. Peter,* the Nebraska Supreme Court was presented with its first opportunity to apply the specific language of footnote 5. The lower court, due to what it found to have been fluctuations in the father's annual income, had utilized income averaging as an

appropriate method for determining whether there had been a material change in circumstances that would require a modification in child support. On appeal, the Nebraska Supreme Court found that the evidence provided by the father had revealed a clear pattern of consistently increasing income. The Supreme Court determined that it was not in the best interests of the children to allow income averaging when the father's income was consistently increasing. The Supreme Court noted the proposition that as a general matter, the parties' current earnings are to be used in calculating child support. *Peter v. Peter, supra.* The Supreme Court found no reason to deviate from this principle under its de novo review and determined that on remand, the lower court should use the parties' current earnings in calculating the father's child support obligation.

In *State on behalf of Hannon v. Rosenberg,* this court was faced with a steady decline in the father's income, as opposed to a steady increase, but found the rationale of *Peter v. Peter* equally applicable. The father's income had shown a steady decrease since 1997, as opposed to the "substantial fluctuations" required by footnote 5. The father had received a cut in pay in 1999 that had continued for approximately 16 months, and there was no indication that his pay would increase in the future. This court stated that "[w]hile using income averaging to increase support is generally beneficial to minor children, this method should only be used when the facts support it." *State on behalf of Hannon v. Rosenberg,* 11 Neb. App. at 524, 654 N.W.2d at 758. We concluded that the facts of the case did not support the use of income averaging and that the district court had erred in using the father's average income for the 3 years prior to trial in calculating child support.

Kit argues that the present case is on point with *State on behalf of Hannon v. Rosenberg* and that the district court erred in not using his "most recent income" as opposed to averaging the last 3 years. Brief for appellant at 9. We initially note that at the hearing, Kit offered a proposed child support calculation utilizing a 2-year income average. Kit did not suggest at any time during the hearing that income averaging was not an appropriate method for calculating his child support. Rather, he argued that a 2-year average, instead of the 5-year average proposed by Deborah, was

appropriate. To the extent that Kit now complains on appeal that income averaging in general is inappropriate in this case, his assignment of error is without merit. A party cannot complain of error which that party has invited the court to commit. *Medlock v. Medlock*, 263 Neb. 666, 642 N.W.2d 113 (2002).

We do find *State on behalf of Hannon v. Rosenberg*, 11 Neb. App. 518, 654 N.W.2d 752 (2002), distinguishable from the present case and, upon our de novo review, conclude that the district court did not err in utilizing a 3-year income average in calculating Kit's child support obligation. In *State on behalf of Hannon v. Rosenberg*, the father's income was derived from an hourly wage. There was nothing in the record in that case to indicate that the pay decrease suffered by the father in 1999 was temporary in nature. In the present case, Kit's income is derived from farming, a profession that is subject to income fluctuations based on a variety of factors. Kit acknowledged that his income as a farmer has been subject to fluctuation, a fact borne out by our review of Kit's tax returns from 1998 through 2002. Kit's income fell from 1998 to 1999, rose from 1999 to 2000, and fell again from 2000 to 2002. Kit testified that his income as a farmer is subject to a variety of factors, including the farm economy, weather conditions and crop yields, and government payments, each of which might clearly rise or fall on a basis independent of the other factors. Kit's testimony indicated that the farm economy had experienced something of a rebound but that drought conditions were still expected for 2003 and government payments were not expected to increase significantly for 2003. Upon our de novo review, we find that the district court did not abuse its discretion in utilizing a 3-year income average in calculating Kit's child support obligation. This is not to say that the principles announced in *Peter v. Peter*, 262 Neb. 1017, 637 N.W.2d 865 (2002), and *State on behalf of Hannon v. Rosenberg* could never be applicable in calculating the child support obligation of someone engaged in the farming profession. However, given the facts of this particular case, we conclude that the increase and decrease shown in Kit's last 3 years of income are more akin to the "substantial fluctuations" required by footnote 5 than to the steady decrease in income experienced by the father in *State on behalf of Hannon v. Rosenberg*. We find no abuse of discretion by

the district court in this case in using income averaging to calculate child support.

*Visitation.*

██ Kit asserts that the district court erred in not awarding him additional summer visitation time with a corresponding reduction in his child support obligation during the extended visitation period. Visitation rights established by a marital dissolution decree may be modified upon a showing of a material change of circumstances affecting the best interests of the children. *Fine v. Fine*, 261 Neb. 836, 626 N.W.2d 526 (2001). In the context of marital dissolutions, a material change of circumstances means the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently. *Gallner v. Hoffman*, 264 Neb. 995, 653 N.W.2d 838 (2002).

The district court found no change in circumstances to support Kit's request for a change in his summer visitation rights, and upon our de novo review of the record, we agree with this finding. Kit presented little, if any, testimony concerning changed circumstances, and the only testimony that the increased summer visitation would be in the best interests of the parties' minor son was Kit's conclusive statement to that effect. While we applaud Kit's desire to have a closer relationship with the minor son, such a desire alone does not constitute a material change of circumstances. The established visitation schedule is a liberal one which should provide Kit with many opportunities to develop the desired relationship with the son. The district court did not abuse its discretion in refusing to award Kit expanded summer visitation rights.

## CONCLUSION

The district court did not abuse its discretion in utilizing a 3-year income average in calculating Kit's child support obligation. Further, the district court did not abuse its discretion in refusing to award Kit expanded summer visitation rights.

AFFIRMED.