## CONCLUSION

In conclusion, we find that the trial court did not abuse its discretion by allowing Michalski to testify as an expert over Cox's objection and allowing her testimony regarding strangulation over his objection. Therefore, we affirm.

AFFIRMED.

———————

MARK J., APPELLEE, V. DARLA B., FORMERLY
KNOWN AS DARLA J., APPELLANT.
___ N.W.2d ___

Filed February 11, 2014.    No. A-13-394.

1. **Modification of Decree: Appeal and Error.** Modification of a dissolution decree is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and which will be affirmed absent an abuse of discretion by the trial court.
2. **Divorce: Modification of Decree: Visitation.** Visitation rights established by a marital dissolution decree may be modified upon a showing of a material change of circumstances affecting the best interests of the children.
3. **Modification of Decree: Words and Phrases.** A material change in circumstances means the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently.
4. **Visitation.** The party seeking to modify visitation has the burden to show a material change in circumstances affecting the best interests of the child.
5. **Visitation: Parent and Child.** Visitation relates to continuing and fostering the normal parental relationship of the noncustodial parent with the minor children of a marriage which has been legally dissolved.
6. **Visitation.** The best interests of the children are primary and paramount considerations in determining and modifying visitation rights.
7. **Evidence: Appeal and Error.** When the evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.
8. **Courts: Child Custody: Visitation.** It is the responsibility of the trial court to determine questions of custody and visitation of minor children according to their best interests, which is an independent responsibility and cannot be controlled by the agreement or stipulation of the parties or by third parties.

Appeal from the District Court for Garfield County: KARIN L. NOAKES, Judge. Affirmed in part, and in part reversed and remanded for further proceedings.

Chris A. Johnson, of Conway, Pauley & Johnson, P.C., for appellant.

John A. Wolf and Mark Porto, of Shamberg, Wolf, McDermott & Depue, for appellee.

Inbody, Chief Judge, and Moore and Riedmann, Judges.

Inbody, Chief Judge.

## INTRODUCTION

Darla B., formerly known as Darla J., appeals the order of the Garfield County District Court modifying the decree dissolving her marriage to Mark J. and terminating her visitation with the parties' minor child, Jacey J.

## STATEMENT OF FACTS

Darla and Mark's marriage was dissolved by a decree of the district court on May 17, 2005, in which Mark was awarded custody of Jacey and Darla was awarded visitation. On May 4, 2009, Mark filed a petition for a modification of visitation, alleging that visitation with Darla was "placing [Jacey] in great harm" and requesting that visitation be returned from unsupervised to supervised visitation at the recommendation of Jacey's psychologist and therapist. Darla denied the allegations and filed a counterclaim seeking custody of Jacey.

In December 2009, the district court granted Darla specific visitation and ordered that the visitation was to be supervised until further order of the court. In 2010, Darla filed a motion to terminate supervised visitation, alleging that she posed no threat to Jacey and that there had been no issues with supervised visitation, while Mark filed a motion indicating that the visitations needed to be more strictly supervised. In May 2010, the district court denied Darla's motion and ordered that all other terms of visitation remain in effect.

In October 2010, Mark filed an application for termination of visitation, alleging that visitation between Darla and Jacey was placing Jacey in great harm. The application indicated that in June 2010, Jacey was taken to a Nebraska State Patrol office by the individual supervising Darla's visitation, whereupon Jacey reported that she was being sexually abused

by Mark, which report had led to the initiation of a juvenile action. The petition further alleged that shortly thereafter, Jacey recanted her statements and admitted that Darla had coached her to make false statements by threatening and intimidating Jacey. Mark's petition indicates that the reports of sexual abuse were unfounded. Darla denied the application and requested that it be dismissed.

In October 2011, Darla filed a complaint for contempt, alleging that Mark had cut off all visitation between her and Jacey, in violation of the court's previous orders. A hearing was held on the complaint for contempt, after which the court found that there was insufficient evidence to hold Mark in contempt.

At trial, Mark testified that since the parties separated, there had been a long history of manipulation on Darla's part and problems with allegations of Mark's sexually abusing Jacey. Mark recounted several occasions of Darla's reporting to law enforcement that Mark was abusing Jacey, which reports resulted in Jacey's being removed from Mark's custody while he was investigated. Each time, the allegations came back unfounded. Mark testified that Jacey recanted the allegations of sexual abuse she made in 2010.

Mark admitted that he had stopped visitation between Darla and Jacey based upon the advice of a psychologist. Thereafter, supervised visitations were ordered, and Mark explained that Jacey began coming home from visitations with Darla with tape recorders and cell phones given to her by Darla, with which, Jacey explained, Darla had told her to record what was going on at Mark's home. On another occasion, Jacey began receiving notes left by Darla in Jacey's locker at her high school.

Jacey took the stand and testified that she was 13 years old and attended high school. Jacey testified that she lived with Mark and her stepmother and siblings. Jacey testified that one of the supervised visitation workers, Darla's husband, and a family friend took her to the State Patrol office, where she told the State Patrol that Mark had sexually abused her. Jacey testified that Darla told her on several occasions to tell the lie and that she complied because she was scared of Darla, who had

threatened to kill her and her family members. Jacey testified that Darla would give her a note at visitations and tell her to memorize the note "so [Jacey] could say it." Jacey testified that she eventually told the truth that Mark had not hurt her and that Darla had told her to make the accusations. Jacey explained that visitations with Darla "go okay," but that she no longer wanted to have visitation with her because she wanted "a normal life."

Darla's current husband, Tim B., testified that he saw Jacey during her visitations with Darla, beginning in 2008. Tim testified that Darla and Jacey's relationship was good and that Darla and Jacey had fun together. Tim described Jacey as fun-loving and outgoing and said Darla and Jacey are very similar. Tim testified that he was very surprised at Jacey's testimony in court, because Jacey always referred to Darla as "[M]om" and usually referred to Mark as only "Mark" and not "[D]ad." Tim testified that Darla is very upset at not being able to see Jacey and that he and Darla still attend Jacey's activities, but keep their distance.

Tim testified that in the week before he and Darla took Jacey to the State Patrol office, Jacey had not directly told Darla and him what was going on with Mark, but was giving them hints such as telling them that Mark was showering with her and threatening her by putting a gun to her head. Tim testified that Jacey told them Mark had threatened to kill Darla, Jacey, and Tim. Tim testified Jacey made statements that Mark had shaved her legs and that she was afraid. Tim testified that on the day they went to the State Patrol office, Jacey indicated that she was ready to tell the truth, but that Darla did not want her to go because Darla was afraid. Tim testified that Jacey's testimony about the note and what happened on that day was not accurate and that no note was given to Jacey. Further, Tim testified that there was no discussion in the vehicle about what Jacey should report to law enforcement.

A friend of Tim and Darla's testified that he traveled with Tim, Jacey, and the supervised visitation worker to take Jacey to speak with the State Patrol. The friend testified that he had been aware there was a possibility that at some point during one of Jacey's visits, they would take her to law enforcement.

The friend testified that he was aware of Darla's and Tim's concerns about sexual abuse for several months. He testified that Jacey was not given a note to review and that they did not stop on the way to the State Patrol office. He explained that on the way, Jacey was happy and acted normally.

A clinical psychologist testified that she had twice evaluated Darla and, in the past, had conducted counseling sessions with her. She testified that the evaluations were completed in November 2003 and January 2013. She explained that in 2013, Darla requested a psychological evaluation because Darla was concerned about an upcoming court date and visitation. The clinical psychologist concluded that Darla did not meet the criteria for any specific clinical diagnosis and was not in need of any further counseling. She testified that the evaluation did not provide any specific information regarding risk to a child. She further explained that there was no indication of sociopathic or antisocial personality features which would indicate mistruths and that there was no evidence of depression or anxiety.

Erika Williams, a family support and supervised visitation worker, testified that she began supervising visits with Darla and Jacey in December 2009 and continued through June 2010, which end coincided with a trip to the State Patrol office with Jacey, Tim, and Tim and Darla's friend. Williams testified that as a supervised visitation worker, she has the responsibility to make sure that the child remains safe during the visit.

Williams testified that Darla was always prepared for Jacey's visits and was always accommodating of Jacey's activities. Williams described Darla as involved and active with Jacey during the visits. Williams testified that on two occasions in 2010, Jacey had told her that something was going on between her and Mark and also that Mark had shaved Jacey's legs, although Williams later testified that June 2010 was the first time she had heard about allegations regarding Mark and that any other incident she had heard about, she heard about from Darla. Williams testified that on June 29, 2010, Jacey told Williams that because of the incident of Mark's shaving her legs, she wanted to go speak with law enforcement. Williams

testified that Jacey was never given a note to study as to what she should say and also that on the way to the State Patrol office, they did stop at a gas station, as Jacey had testified, but that Jacey did not get out of the vehicle. Williams submitted her visitation records as an exhibit, but testified that the records from June 29 had gone missing and that she did not know where they were. On cross-examination, Williams testified first that the group did not stop at a gas station on the way to the State Patrol office and later that she did not remember if they had or not.

Several of Darla's friends testified on her behalf, each indicating that Darla and Jacey had a close relationship and loved each other. Many of those friends testified that they observed no hesitation or fear in the relationship between Darla and Jacey, and none had ever heard Darla threaten or speak poorly to Jacey.

Darla testified that there have been problems with her and Mark's relationship regarding Jacey. Darla testified that Mark made it difficult for her to see Jacey and that he refused her visitation on several occasions. Darla explained that after so many refusals, she initiated a contempt proceeding, and that she had since agreed to other visitation options.

Darla testified that in 2003, she walked in on Jacey, who was 4 years old at the time, fondling herself and that Jacey said "she was doing what her daddy does." Darla testified that upon the recommendation of a lawyer, she took Jacey to a child advocacy center where Jacey was interviewed, but that she did not specifically discuss with the center's personnel what Jacey had said. In 2005, Darla testified, Jacey told her that Mark had "used a Barbie leg and put it [into Jacey's] bottom." Darla testified that another lawyer told her to go to Iowa to talk to someone in connection with this incident and that Jacey was interviewed, but not taken into protective custody. In 2010, as set forth above, Jacey was taken to a State Patrol office for allegations regarding Mark. Darla did not go with Jacey on that occasion because she did not like the idea of Jacey's going to the State Patrol office, because Jacey had already reported Mark on three occasions and the blame ended on Darla. Darla explained that over the years, Jacey had told

her that Mark was shaving her legs and would refer to Mark as only "Mark" and not "[D]ad."

Darla testified that Jacey was very happy and excited prior to leaving with Tim and Williams to go make the report to law enforcement. Darla testified that she had not given Jacey a note providing things to say and had never told Jacey what to report. Darla further testified that she had never threatened Jacey with bad consequences and had not threatened Mark or his family. Darla testified that Jacey was removed from both Darla's and Mark's homes for several weeks and that a juvenile case was initiated, although it was later dismissed and Jacey was placed back in Mark's custody.

Darla explained that after that time, Jacey responded differently to Darla; for example, instead of grinning at Darla when she came to Jacey's activities, Jacey would glare at her and did not wave. Darla testified that these actions were because of Mark, who had always tried to keep Jacey away from her. Darla testified that she had supervised visitations with Jacey and that the visitations went "[g]reat." Darla testified that none of the visits were bad but that in the fall of 2012, she had to stop visitations because paying for supervision was expensive. Darla testified that Jacey began to cut visits short because of her activities. Darla testified that Mark "guards" Jacey at activities, not allowing her to be near Darla. Darla requested that the supervised visitation be terminated, and she submitted a proposed parenting plan for visitation.

Darla testified that she wanted to take Jacey to Hawaii, but that she did not communicate in any way to Jacey that she was going to kidnap her and take her to Hawaii to hide. Darla admitted that she sent Jacey home with a tape recorder and a cell phone. Darla explained that in the summer of 2010, Jacey asked Darla for a cell phone so she could text and call Darla whenever she wanted to. Darla further explained that the tape recorder was given to Jacey before any of the court orders, in the spring of 2009, because Jacey wanted to have it to record what happened in the bathroom in order to prove what happened. Darla testified that she did not like the idea, but eventually gave in. The tape recorder was not returned to Darla, and she did not receive any recordings.

Darla testified that on one occasion, she went into Jacey's school and left her a note in her locker, which note Darla explained was a Thanksgiving card. Darla also testified that she had asked others to put cards in Jacey's locker on other occasions. Darla testified that she believed Jacey was lying when she testified that she no longer wanted visitation with Darla and that Jacey also lied about Darla's giving her a note which told her what to say at the State Patrol office.

The district court entered an order modifying the dissolution decree, finding that there had been a material change of circumstances since the entry of the decree, such that the relationship between Darla and Jacey had deteriorated and Jacey no longer wished to have contact with Darla. The court found that Jacey was 13 years old and had admitted that when she was 9 or 10, Darla convinced her to report that Mark had sexually abused her after Darla made "various threats" to Jacey. The court found that there was evidence that Darla coached Jacey and gave her a note to memorize before reporting to law enforcement. The court noted that Darla had denied threatening or coaching Jacey, but found that her testimony was evasive, contradictory, and misleading. The court found that Darla had demonstrated an ability and inclination to secretly and inappropriately communicate with Jacey without the knowledge of the court, Mark, the school system, and the visitation supervisor. The court found that Jacey had matured since the reports of abuse, had attended therapy, and was doing well in her current placement. The court found that Jacey was getting along with her siblings and had a close relationship with Mark and her stepmother. The court found that the "mental anguish and distress this child has suffered since her parent[s'] separation and divorce due to the actions of her mother [are] extreme and abusive."

The court ordered that visitation with Darla was not in Jacey's best interests and modified the decree by disallowing any further visitation between Darla and Jacey. The court ordered that should Jacey desire contact or parenting time with Darla, it may occur at Mark's discretion, with conditions which may include that any such visitation be supervised or that it occur in or near the city in which they live and which

must include that Jacey be given the authority to end the visit at any time.

## ASSIGNMENT OF ERROR

Darla assigns, consolidated and rephrased, that the district court abused its discretion by terminating her visitation rights.

## STANDARD OF REVIEW

[1] Modification of a dissolution decree is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and which will be affirmed absent an abuse of discretion by the trial court. *Metcalf v. Metcalf*, 278 Neb. 258, 769 N.W.2d 386 (2009); *Rouse v. Rouse*, 18 Neb. App. 128, 775 N.W.2d 457 (2009).

## ANALYSIS

Darla has alleged five assignments of error, all of which revolve around her contention that the district court abused its discretion by modifying the dissolution decree to terminate her parental visitation with Jacey. Specifically, the district court modified the dissolution decree by terminating any further visitation by Darla with Jacey, unless Jacey wished to have visitation, at which time it would be allowed at Mark's discretion. In making this modification, the district court found that Darla and Jacey's relationship had deteriorated as a result of Darla's forcing Jacey to lie, by threats and manipulation. The court further found that Darla was engaging in secret communication with Jacey.

[2-4] Visitation rights established by a marital dissolution decree may be modified upon a showing of a material change of circumstances affecting the best interests of the children. *Fine v. Fine*, 261 Neb. 836, 626 N.W.2d 526 (2001). A material change in circumstances means the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently. *Donscheski v. Donscheski*, 17 Neb. App. 807, 771 N.W.2d 213 (2009). The party seeking to modify visitation has the burden to show a material change in circumstances affecting the best interests of the child. See *Schulze v. Schulze*, 238 Neb. 81, 469 N.W.2d 139 (1991).

[5,6] Visitation relates to continuing and fostering the normal parental relationship of the noncustodial parent with the minor children of a marriage which has been legally dissolved. *Walters v. Walters*, 12 Neb. App. 340, 673 N.W.2d 585 (2004). The best interests of the children are primary and paramount considerations in determining and modifying visitation rights. *Fine v. Fine, supra*.

The record indicates that the testimony adduced at trial presented the court with two completely contradictory stories. On one hand, the testimony of Darla and her witnesses indicates that Darla and Jacey have a normal, happy, and healthy mother-daughter relationship. Darla testified that she had never forced Jacey to lie about allegations of sexual abuse and had never threatened Jacey to force her to make said allegations. On the other hand, Jacey testified that Darla forced her to memorize statements regarding sexual abuse to report to law enforcement and threatened her if she did not. Jacey testified that she wants to have a "normal" life and does not want any further contact with Darla because of her actions and manipulation.

[7] When the evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Edwards v. Edwards*, 16 Neb. App. 297, 744 N.W.2d 243 (2008). We give weight to the district court's findings, and particularly the district court's determination that Darla's testimony was evasive, contradictory, and misleading.

The primary material change in circumstances in this case revolves around Darla's manipulation and failure to follow court orders. The record indicates that Darla has secretly placed notes in Jacey's locker and, on numerous occasions over the past several years, has facilitated or directly reported allegations that Mark has sexually abused Jacey, all of which reports have been investigated and determined to be unfounded and which in the meantime resulted in Jacey's being taken out of both parents' homes and temporarily placed into foster care. At trial, Jacey, who was 13 years old, testified that she had reported to the State Patrol that Mark had sexually abused

her, but admitted that it was a lie and that she had been forced by Darla to tell that lie. Jacey described how Darla secretly gave her a note and threatened her to force her to memorize its contents or face the possibility of Darla's hurting Jacey or her family. This has resulted in extreme distress and confusion for Jacey and in the quick deterioration of her relationship with Darla, so much so that Jacey testified that she no longer wishes to have any contact with Darla.

While Darla clearly made bad decisions that resulted in numerous attempts to detrimentally interfere with Jacey and Mark's relationship, we find that the district court's modification of the dissolution decree is inequitable. The district court modified the decree to disallow Darla any parenting time. We affirm this portion of the district court's order. However, the court further determined that if Jacey wished to have contact or parenting time with Darla, such may occur at Mark's discretion and in accordance with any terms and conditions which Mark "deems are in [Jacey's] best interest." This is an unlawful delegation of the district court's responsibility.

[8] It is the responsibility of the trial court to determine questions of custody and visitation of minor children according to their best interests. This is an independent responsibility and cannot be controlled by the agreement or stipulation of the parties or by third parties. See, *Deacon v. Deacon*, 207 Neb. 193, 297 N.W.2d 757 (1980), *disapproved on other grounds*, *Gibilisco v. Gibilisco*, 263 Neb. 27, 637 N.W.2d 898 (2002); *Lautenschlager v. Lautenschlager*, 201 Neb. 741, 272 N.W.2d 40 (1978).

In *Deacon*, the Supreme Court reversed an order which granted a psychologist the authority to effectively determine visitation and to control the extent and time of such visitation, concluding that such an order was "not the intent of the law and is an unlawful delegation of the trial court's duty. Such delegation could result in the denial of proper visitation rights of the noncustodial parent." *Id*. at 200, 297 N.W.2d at 762. As authority for its conclusion, the *Deacon* court cited *Lautenschlager*. In *Lautenschlager*, the court observed:

> The rule that custody and visitation of minor children shall be determined on the basis of their best interests,

long established in case law and now specified by statute, clearly envisions an independent inquiry by the court. The duty to exercise this responsibility cannot be superseded or forestalled by any agreements or stipulations by the parties.

201 Neb. at 743-44, 272 N.W.2d at 42. The Supreme Court in *Deacon* specifically took note that the reasoning of *Lautenschlager* was being extended to third parties.

The reasoning of *Deacon* has, in turn, been applied in several contexts. In *Ensrud v. Ensrud*, 230 Neb. 720, 433 N.W.2d 192 (1988), the Supreme Court disapproved of a district court order in a divorce proceeding authorizing a child custody officer to control custody of a minor child and the visitation rights of the parents and found it was a delegation of judicial authority unauthorized in Nebraska law. In *In re Interest of Teela H.*, 3 Neb. App. 604, 529 N.W.2d 134 (1995), this court held that the order of a juvenile court granting a psychologist the authority to determine the time, manner, and extent of a parent's visits with a minor child was an improper delegation of judicial authority. In doing so, we cited, inter alia, *In re Interest of D.M.B.*, 240 Neb. 349, 481 N.W.2d 905 (1992). In the latter case, the Supreme Court held that it was plain error for a juvenile court to require that a parent participate in a particular support group on a regular basis and follow all directions of a counselor. *Id.* The *In re Interest of D.M.B.* court emphasized, "It is the court's duty, not that of counselors, Department of Social Services workers, social workers, child protection workers, or probation officers to fix the terms and limitations of a rehabilitation provision." 240 Neb. at 362, 481 N.W.2d at 914-15.

We are aware that a custodial parent, by the nature of most custody circumstances, exercises significant control over a noncustodial parent's visitation rights, but that does not include carte-blanche authority as to parental visitation and contact. We conclude that the district court abused its discretion by determining that if Jacey wished to have contact or parenting time with Darla, such may occur at Mark's discretion and in accordance with any terms and conditions which Mark "deems are in [Jacey's] best interest." Therefore, we remand

this matter to the district court for the purpose of holding a hearing within 30 days of the mandate for entry of an order in conformity with this opinion. Furthermore, we order that Jacey be appointed a guardian ad litem to assist Jacey in the future in determining matters related to whether or not it is in her best interests to renew visitation with Darla.

## CONCLUSION

For the reasons set forth above, we affirm in part, and in part reverse the decision of the district court and remand the cause for further proceedings consistent with this opinion.

AFFIRMED IN PART, AND IN PART REVERSED AND
REMANDED FOR FURTHER PROCEEDINGS.