IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

SILVER V. SILVER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

HEATHER S. SILVER, APPELLEE,

V.

RONALD L. SILVER, APPELLANT.

Filed June 5, 2018.    No. A-17-537.

Appeal from the District Court for Lancaster County: JOHN A. COLBORN, Judge. Affirmed in part, and in part remanded with directions.

Sandra Stern for appellant.

B. Gail Steen, of Steen Law Office, for appellee.

PIRTLE, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Ronald L. Silver appeals the Lancaster County District Court's April 2017 order which denied his request to modify custody and parenting time, but increased his child support and made it retroactive to December 2014. In addition to custody, parenting time, and child support matters, Ronald also raises issues related to the district court's review of evidence, off-the-record procedures, and Ronald's request for a contempt order against Heather S. Silver. We remand the matter back to the district court with directions to consider Ronald's ability to pay the retroactive child support ordered. In all other respects, we affirm the district court's modification order.

## II. BACKGROUND

Ronald and Heather have two minor children, Grace (born in 2002) and Sam (born in 2004). The parties were divorced in February 2014. Pursuant to the amended decree filed in April,

- 1 -

Heather was awarded sole legal and physical custody of the children, subject to Ronald's supervised parenting time from noon until 5 p.m. on 1 day every weekend. Ronald was ordered to pay child support of $212.40 per month (adjusted down from the calculated amount of $428 per month to keep Ronald at the basic minimum subsistence level).

A few months later, in July 2014, Ronald filed a complaint to modify the amended decree, and asked the court to grant him unsupervised parenting time. He alleged that since the entry of the decree, it had "been demonstrated that it is not necessary nor in the children's best interest[s]" for his parenting time to be supervised. In November, Heather filed an "Amended Answer and Cross Complaint." She generally denied the allegations in Ronald's complaint to modify. She also asked the court to increase child support, alleging that since the entry of the decree there had been a material change in circumstances in relation to Ronald's income.

In September 2015, Heather filed a motion for an order to show cause, alleging that Ronald failed to reimburse her for child care and attempted to have unsupervised contact with the children. (Heather's contempt allegations against Ronald were ultimately heard at the time of the modification trial.)

From October 28, 2015, through February 2016, the modification action was stayed pending Ronald's bankruptcy proceedings.

In March 2016, Ronald filed an amended complaint to modify, again alleging that since the entry of the decree, it had been demonstrated that it is not necessary nor in the children's best interests that his parenting time be supervised. He also alleged that Heather had interfered with and attempted to alienate the children's relationship with Ronald, and that her mental health was a detriment to the children. He asked the court to award him legal and physical custody of the minor children, subject to Heather's parenting time. He also asked the court to order Heather to pay child support. In April, Heather filed an "Answer to Amended [sic] and Cross Complaint." She denied the allegations in Ronald's amended complaint to modify. And she once again asked the court to increase child support.

In April 2016, Ronald filed an application for an order to show cause, alleging that Heather had denied his court-ordered parenting time. (Ronald's contempt allegations against Heather were ultimately heard at the time of the modification trial.)

Trial was held on the modification and contempt actions in June 2016 and continued in April 2017. In the interim, Ronald and the children attended family therapy. And in March 2017, Ronald filed another application to show cause, alleging that Heather denied his court-ordered parenting time "for several weeks."

In its order filed on April 20, 2017, the district court found that neither party proved the other in contempt of the court's orders. The court also found that Ronald failed to prove a material change in circumstances as to custody or parenting time. The court concluded it was in the best interests of the children to remain in the legal and physical custody of Heather, subject to agency-supervised parenting time with Ronald once per week on the weekend from noon until 5 p.m. Ronald was ordered to arrange and be responsible for all costs associated with the supervised parenting time.

The court did find that since the entry of the decree, there had been a material change in circumstances as to the parties' income resulting in more than a 10-percent change in the child support. Ronald was ordered to pay child support in the amount of $761 per month (for two

children), commencing on December 1, 2014. He was also ordered to pay one-half of the medical costs above $480 per child per year. A judgment was entered against Ronald in the amount of $1,792.83 for past due child care and medical costs. He was ordered to pay "a minimum of [$50] per month in addition to his child support and other financial obligations for the support of the minor children until such time as the judgment against him is paid in full."

Ronald appeals.

## III. ASSIGNMENTS OF ERROR

Ronald assigns, restated, that the district court erred by (1) not awarding him custody of or unsupervised parenting time with the minor children, (2) modifying his child support obligation in a way that left him below the minimum subsistence poverty level and by not awarding him a dependency exemption for purposes of income tax filing, (3) not finding Heather in contempt for denying his court-ordered parenting time, (4) not reviewing all of the evidence received, and (5) holding certain proceedings and arguments and making certain findings and orders off the record.

## IV. STANDARD OF REVIEW

An appellate court reviews child custody determinations de novo on the record, but the trial court's decision will normally be upheld absent an abuse of discretion. *Flores v. Flores-Guerrero*, 290 Neb. 248, 859 N.W.2d 578 (2015). An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id*.

Parenting time determinations are also matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *State on behalf of Maddox S. v. Matthew E.*, 23 Neb. App. 500, 873 N.W.2d 208 (2016).

In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004).

Modification of child support payments is entrusted to the trial court's discretion, and although, on appeal, the issue is reviewed de novo on the record, we will affirm the trial court's decision absent an abuse of discretion. *Freeman v. Groskopf*, 286 Neb. 713, 838 N.W.2d 300 (2013). Whether a child support order should be retroactive is also entrusted to the discretion of the trial court, and we will affirm its decision absent an abuse of discretion. *Id*.

In a civil contempt proceeding where a party seeks remedial relief for an alleged violation of a court order, an appellate court employs a three-part standard of review in which (1) the trial court's resolution of issues of law is reviewed de novo, (2) the trial court's factual findings are reviewed for clear error, and (3) the trial court's determinations of whether a party is in contempt and of the sanction to be imposed are reviewed for abuse of discretion. *Hossaini v. Vaelizadeh*, 283 Neb. 369, 808 N.W.2d 867 (2012).

## V. ANALYSIS

### 1. CUSTODY OR UNSUPERVISED PARENTING TIME

Ronald claims that the district court erred when it declined to modify the amended decree to award him custody of the parties' children or, at a minimum, unsupervised parenting time with the children. He argues that the evidence showed Heather was "causing extreme alienation between the children and [Ronald]." Brief for appellant at 35.

Ordinarily, custody of a minor child will not be modified unless there has been a material change in circumstances showing that the custodial parent is unfit or that the best interests of the child require such action. *State on behalf of Slingsby v. Slingsby*, 25 Neb. App. 239, 903 N.W.2d 491 (2017). First, the party seeking modification must show a material change in circumstances, occurring after the entry of the previous custody order and affecting the best interests of the child. *Id*. Next, the party seeking modification must prove that changing the child's custody is in the child's best interests. *Id*. A material change in circumstances means the occurrence of something which, had it been known at the time of the initial decree, would have persuaded the court to decree differently. *Id*. The party seeking modification of child custody bears the burden of showing as an initial matter that there has been a change in circumstances. *Id*.

Likewise, the right of parenting time is subject to continuous review by the court, and a party may seek modification of a parenting time order on the grounds that there has been a material change in circumstances. *State on behalf of Maddox S. v. Matthew E., supra*.

Neither the decree nor the amended decree (both prepared by Heather's attorney) set forth the reasons why Heather was granted sole custody of the children or why Ronald's parenting time was to be supervised. However, we note that Ronald also had supervised parenting time at the time of a temporary order in July 2013. At the modification hearing, Heather testified that when Ronald was first granted supervised visits in July 2013, he "refused to do it," and then he "had one visit with [the children] that whole year." The children felt like they had been abandoned. According to Heather, it was a difficult time for Sam; he was devastated when Ronald did not see him.

When asked what material changes had occurred since the decree that he would like the court to consider, Ronald said that he has exercised his visitation privileges to the best of his ability, the visits have been good, he is actively employed, he is happy, he associates with healthy people, he is active with his church, he is an approved mentor (transporting people for church activities), he volunteers at Food Net, and he has a healthy life. "[O]n a personal level," he did some "soul searching" after his separation, and thinks he has become "more humble and more patient and loving."

Ronald is asking for custody of the children for several reasons. He thinks it is important that both parents have a good relationship and that they encourage a good relationship with the children; he does not believe that Heather encourages the children to have a relationship with him.

The record is clear that the parties have a contentious relationship. Heather testified that she had two protection orders against Ronald: one in 2013 and one in 2014, and each was in place for 1 year. She called the police to report a violation of the protection order in August 2014 after Ronald disregarded prearranged times which would have allowed the two of them to attend a school open house separately (because of the protection order), and showed up when Heather was there. Ronald testified that he was escorted by the principal the entire time. Heather also called the

police when she saw him removing items from a neighbor's garage; Ronald said he was returning a shovel and borrowing an item. Ronald claims the "unfounded" police calls are traumatizing for the children.

Ronald also claims that Heather's alcohol use is problematic. There was conflicting evidence from two witnesses as to whether or not Heather was drunk on Halloween 2014, and whether she drove with the children in the car while she was under the influence. Heather testified that she was diagnosed as an alcoholic when she was 17 years old. She now drinks "[o]ne or two drinks" "[m]aybe a few times a month." When asked if, since the decree, she had ever driven drunk with her children, Heather responded, "No."

Dr. Helen Montoya, a licensed psychologist, conducted mental status and psychological evaluations on Heather and Ronald in the summer of 2015. Dr. Montoya testified that Heather was diagnosed with alcohol use disorder, unspecified; cannabis use disorder in sustained remission; and personality disordered traits, which were borderline and histrionic. Her borderline personality traits include an "[i]ntolerance of being alone; fear of abandonment; unstable and intense inter-personal relationship; impulsivity that can be at times self-damaging; effective instability, a marked reactionary mood; [and] inappropriate, intense anger with difficulty controlling anger." Dr. Montoya stated that "the emotional reactivity is going to contribute to the children's emotional well[-]being or sense of stability. And the rapidly shifting moods will in some fashion affect the home environment."

Dr. Montoya diagnosed Ronald with an "[a]djustment disorder with mixed anxiety and depression; cannabis abuse, in sustained full remission; [and] personality disordered traits of compulsivity and narcissism." She described a compulsive trait as "a tendency to be very rigidly set in their way of doing things or of completing tasks, a tendency toward needing order and a specific environment, which leads to controlling behavior." And a narcissistic trait is a "tendency toward needing a high level of attention, affection and admiration. A tendency toward genuinely believing that their way is the correct, appropriate way." She acknowledged that based on her interview and testing of Ronald that he is controlling in a relationship. After evaluating Ronald, Dr. Montoya did not find any evidence that he would be a physical danger to Heather or the children. However, Dr. Montoya did not speak to the children's therapist or anyone at the visitation agency.

Dr. Montoya had never met Grace or Sam. However, in her evaluation reports for Ronald and Heather, Dr. Montoya stated that she reviewed the visitation notes which indicate that Sam had been exposed to negative attitudes and commentary toward his father. When asked if she believed that it would be useful to have therapeutic visits with the children to try to build a relationship, Dr. Montoya said, "I do."

Dr. Kelly Love is a psychologist and is the director of behavioral health at the Lincoln Family Medicine Program. She has been treating Sam and Grace since 2014; Heather brought them in because of adjustment difficulties due to the parties' separation. Sam's current diagnosis is adjustment disorder with anxiety and depressed mood; "that basically means that the person is experiencing a significant stressor in their life, that they're manifesting anxiety and depression that is above and beyond what would typically be expected as a result of a significant stressor in their life." Dr. Love said that "[t]he significant stressor that he has informed me [of] is his fear of [Ronald]; his anger towards [Ronald]; his fear that he will be, in his own words, that his father is

going to kill him; his anger towards the lack of contact in the beginning; his fear of being physically harmed by [Ronald]." When Sam talks about his father, his behavior and his emotional state regress to what Dr. Love would consider that of about a 7-year-old child; he will curl up into a fetal position, start sucking his thumb, rock, and cry.

Grace's current diagnosis is adjustment disorder with disturbance of conduct, and adjustment disorder with anxiety. Dr. Love said that "[a]djustment disorder with disturbance of conduct is given when a person is having a reaction to significant stressors in their life that is above and beyond what we would typically consider behavior-wise." "[F]or Grace, that disorder was given when she was acting out at home with non compliance, with calling names, those kinds of things." "Adjustment disorder with anxiety is very similar to what I was saying about Sam, expressing more than expected difficulty to a stressor manifested by anxiety." Grace's significant stressors are "feeling as if she is put in the middle between her mother and her father," and "what she reports is her father making disparaging negative comments about the people that she loves, and making negative comments about her to her." Grace and Sam are "exceptionally close," and Grace "feels very, very deeply when she has seen [Ronald] . . . become physical with Sam. And when she sees Sam become exceptionally anxious and worried, she feels that very deeply as well."

Dr. Love testified that Heather has done "a very good job at putting boundaries on the children when they have been very upset." The children "continually refer to [Ronald] as the animal, or as other disparaging names when they get upset, . . . and [Heather] let's them know that, . . . that's not appropriate. She continually tells them, you may be upset right now, but you will likely want to have a relationship in the future and we need to work on making this okay." Heather has also been very receptive to Dr. Love's recommendations. For example, when Sam was acting out during visits and visits were ended early, Sam felt rewarded; Heather was "very receptive" to the suggestion that it was not okay, and that Sam needed to have a consequence when he came home.

Dr. Love had met with Heather during sessions. She never met with Ronald, but said he had left her multiple voicemails. Dr. Love kept track of Ronald's voicemails (by making written entries into the electronic medical record) because she "perceive[d] them to be very threatening in nature." He will often say things like, "'I'll see your butt in court,' 'I'm going to treat you as a hostile witness,' 'you'd better start calling me back,' 'you have five days to get back to me.'" "It's his language, it's his voice, there's a lot of things that make it very threatening." His "emotional lability, the intensity," is concerning because in the span of a message "he will appear to be yelling at me and speaking very intently, and then he will quickly change it to very, very calm"; this is a sign of "emotional dysregulation." She tried to call Ronald back on two different occasions (when his messages were calm), but "the phone just rang." She also responded to his messages by sending him letters. (Ronald testified that the address on those letters was not his, it was his oldest daughter's address; he said he has never received any communication from Dr. Love, either mail or voicemail.) The last phone call or message Dr. Love received from Ronald was on May 23, 2016; he said he was concerned for his children and that he had been unable to see them because Dr. Love stopped the visitations, he said several times it was her "'fault'" he has not been able to see them.

In his voicemails, Ronald also made allegations of parental alienation. Dr. Love explained that "[p]arental alienation is a concept where one parent is said to be poisoning the children against

the other parent. It's usually the custodial parent against a non custodial parent, by making negative derogatory statements." When asked if the children had ever revealed to her that Heather had said negative things about Ronald, Dr. Love responded, "Very, very rarely they have said something, 'But, mom, you said this,' and then it will be explained and then it's over with."

Dr. Love and the children discussed their visits with Ronald, but she never reviewed the visitation notes. The children reported that several visits had gone poorly and they had "been exceptionally distraught and they had reported that there were many negative comments made from [Ronald]," that he would bring things up from the past, and blaming or making accusatory statements toward Heather (e.g. "it's your mother's fault that we're separated," "it's your mother's fault that this had been happening").

Exhibits 39 and 40 were received into evidence by stipulation of the parties. The exhibits contain recordings from some of the visits. Exhibit 39 contains three video clips from December 2015, apparently taken by Grace on her cell phone. Exhibit 40 contains Ronald's audio recordings from five visits in April, May, November, and December 2015, as well as a short "compilation" of recordings. The agency visitation worker for three of those visits testified that he was unaware that Ronald was recording those visits. Three visitation supervisors testified, and visitation notes were received into evidence. The evidence shows that for the most part, Ronald and Grace got along well and had a good time during visits. However, Sam was often agitated and upset during his time with Ronald.

Supervision notes from Better Living for April 2014 through June 2015 were received into evidence. During some visits, Ronald had to be redirected after talking to the children about the case. During visits, Sam made comments that Ronald had kidnapped him. (As reflected in exhibit 40, the audio recordings, Sam said that Ronald kidnapped him in reference to a day (date unknown) when Ronald picked him up early from school when he "had no appointments or nothing.") The notes also show that during one visit, Sam asked Ronald "why visits didn't matter in the past, why Ronald was mean to his mother, [and] why Ronald was 'crazy.'" On another occasion, Heather went to leave after dropping off the children. Sam wanted to go with her, but Heather told him he needed to stay and work on building a relationship with Ronald; Sam stated that Ronald was going to "kill me." Heather assured Sam that he was safe and that he needed to work on his relationship with Ronald. At the beginning of another visit, Sam punched Ronald in the stomach. Ronald told Sam he could leave if he was not going to control himself. Sam then walked to Heather's car. Ronald told Grace that it was not Sam's fault, that Sam was being told what to do by Heather. Ronald also told Grace that they were going to be attending therapy visits and that she and Sam could talk about what they are being told to say.

One of the visitation supervisors from Better Living, who has since changed employment, testified that while at Better Living, he supervised approximately 10 to 20 1-hour visits between Ronald and his children from April to September 2015. He did not have any safety concerns regarding Ronald's parenting, but did "recall on occasions re-directions were made for comments that went against the rules of visitation"; he did not recall what those comments were.

Wendy Gilming has known Ronald and Heather for "close to 20 years." She supervised seven visits between Ronald and his children from November 21, 2015, to January 3, 2016. During visits, Gilming never observed any safety concerns. However, "almost every visit," Sam would call Heather, argue with Ronald, demand things from Ronald, and insult Ronald. During one visit,

Sam and Ronald were playing and Sam's behavior turned extreme; "Sam was on Ron's back and had a hold of his shirt, basically choking Ron, had his other hand around his neck, and kept kicking him with his knees and his feet, and he would punch him in the head." Ronald just kept trying to get Sam to stop hitting. Gilming pulled Sam back, and set Sam on the ground. Sam said it was Ronald's fault they had to move, because he lost the house, and he lost all of his friends when he had to move. When Ronald asked Sam why he would say that, Sam said "'that's what Mom told me.'" The only form of discipline Ronald used was taking Sam's cell phone away after warning him that would be the consequence--because Sam continually called Heather during visits, which was distracting; when Sam did it again, Ron reached over Sam and grabbed the phone. Sam told Ronald he could not do that, that Heather bought that, and that Ronald did not have the right to do that. Sam threw remotes and kicked a computer desk, "throwing a tantrum." Then Grace called Heather and said that Ronald took the phone away, and that caused another problem. According to Gilming, Ronald tried to control the situation in a positive way and never acted inappropriately. Gilming said Sam threatened to kill himself a couple times during visits, which was a great concern to Ronald; this happened at the first visit she supervised and around Christmastime.

Shannon Conway, a family support worker with Pathfinders Support Services, testified that he supervised visits between Ronald and the children starting in September 2016. His visitation notes were received into evidence as exhibit 97, which showed that some of the visits appeared to go well, but others did not. The notes from January 7, 2017, show that Ronald attempted to talk to the children about court and had to be redirected. Also, when the kids sat quietly and did not answer Ronald, he told them he did not like how he was being treated and that the children should not treat people the way they treat him. Grace told Ronald that she treats him the same way he treats her. Conway testified that during the January 14 visit, Ronald told the children they were "acting like ass holes" and that it would not get them very far. Conway intervened and talked to him about not cussing in front of the children or calling them names. The notes from that visit show that when Grace told Ronald that he could not call his children names, he told her that he can call them whatever he chooses. In March, the notes indicated that visits have gone "[a] lot better compared to the past ones"; "everyone got along, there was no arguing, no name calling, they all agreed to do the same things, so it went a lot smoother than what had been happening." According to Conway, Ronald displayed affection towards his children, hugging them at every visit.

Michael Keady is a licensed independent mental health practitioner and a licensed marriage and family therapist. Keady provided family therapy for the family from November 2016 to late January or early February 2017 (which was between the June 2016 and April 2017 trial dates); the purpose was to improve the relationship that existed between Ronald and the children. Most of the therapy was between Ronald and the children. After the last family session, Keady met with Ronald and Heather to share his assessment that the sessions were not productive and that he felt they were traumatic for the children. There were periods that things would be okay and Ronald would "calmly interact" with the children, "but throughout the process, the children were just so resistant to the process, . . . they appeared to me to be very mistrustful and angry towards their father. And on a number of occasions, Ron would react, I believe, without thinking and respond to them in a very angry, intimidating manner." At times the children appeared "very emotionally distraught." Both Heather and Ronald had different views of what happened in their past, but Keady did not find it beneficial to discuss with the children who was right and who was wrong.

Part of the problem the children had with Ronald was that he wanted to discuss who was right and who was wrong. Keady tried to direct Ronald not to continue to have that discussion with the children, but Ronald was not able to follow that recommendation.

In Keady's opinion, at the time therapy was ended, he did not believe that continued therapy would be beneficial to working towards a more normalized relationship between Ronald and the children because "the same pattern was repeating over and over" and Ronald "was not very responsive to my direction to change his pattern of interaction with his children or with his ex-wife." Keady said he "specifically directed [Ronald] not to be communicating with [Heather], and then [Ronald] would share threatening and intimidating emails that he would send to her, and he would also send them to me. I guess he thought they were appropriate. It was very confusing." Keady did not think continued therapy would be helpful unless Ronald "understands that he is the primary problem in terms of how his children think and feel about him." When asked if visits may be traumatic for the children as well, Keady said, "Yes, if [Ronald] was interacting in a controlling or aggressive manner." Keady would support Ronald continuing to see the children on a supervised basis, and said "[i]t might be most productive" if visits were supervised by a mental health professional. (Ronald testified that he had three family sessions with Keady when both children were present--all three sessions ended early. Ronald does not believe that family therapy has occurred in this case.)

Keady testified that he had an opportunity to work with Heather as well and that "she was never inappropriate" and never had to be redirected on how she spoke to the children or Ronald.

Exhibit 102 is Ronald's audio recording of a November 2016 session and a January 2017 session between Ronald, Heather, and Keady. The recordings reflect that in November 2016, Keady wanted to talk about what therapy would look like and said that they were not getting into blame and history, but that they were going to start new; they all agreed that history would be discussed if the children brought it up. Keady also asked that neither parent talk negatively about each other in front of the children, and at Heather's suggestion, also said that the parties should not talk negatively about extended family or therapists. Ronald then said he called Dr. Love a "quack" in front of the children, but thought it went over their heads and they would not know what he meant unless Heather explained it to them. Keady then asked if they could agree to not talk negatively, to which Ronald responded, "I haven't."

The recordings reflect that in January 2017, Keady told Ronald and Heather that the children's relationship with Ronald was so unstable, they all needed to decide what the path forward would be. Keady said the children rely on each other for safety, which is not an appropriate dynamic. He also said that having both children together in therapy was not a manageable situation. He suggested working with Ronald and Grace and then if that moved forward in a productive manner, Keady would engage Sam in a similar process. Keady emphasized that Ronald needed to interact with the children in a productive and positive way, and that over time trust could be developed. Keady needed to see consistent behavioral interaction that was not escalated, and said that the parent needs to remain calm. He told Ronald that he had observed his interactions to be extremely upsetting to the children when discussing Heather, and that Ronald was very escalated in intensity and believed his position was the truth, and the children were in a position to say that was not their memory; both children got so escalated the session had to be ended. Ronald asked Keady, "So we aren't supposed to address false memories?" Keady responded that to have a

relationship with the children right now, Ronald needed to accept the children where they were at and their belief systems. Ronald continued to insist they needed to discuss the past and Heather's undermining of Ronald. Keady said he did not know if Heather was doing that, but that Ronald has told Keady and the children that Heather is doing that. Keady was not going to do family therapy unless he saw Ronald with one child and Ronald followed the direction to not discuss certain subjects, because they cannot get into past issues until one child can be in the same room with Ronald and not express hostility and rage. Ronald continued to insist that if they ignore underlying issues, his relationship with the children would get worse. Keady, Heather, and Ronald ultimately agreed that the process was traumatic for the children, and Keady said for that reason, he would like to discontinue family therapy. Later, when Keady and Ronald were alone, Ronald again brought up parental alienation, but Keady said that Ronald did not have proof. Ronald responded, "You're part of it." And Keady said it could be seen as if Ronald is leading the children. Ronald also referred to Heather as "a crazy."

Since therapy ended, Keady has "continued to receive [from Ronald] text mails, texts, emails criticizing [Keady] personally, talking about [his] family, [and] attacking [him] professionally"; Keady found them threatening in nature. Keady said those contacts "just reinforce[] what I experienced with him, his children, his ex-spouse, and then I got to personally experience."

Exhibits 28 and 81 are a collection of emails Ronald sent Heather during the pendency of this action. We include a small sampling of excerpts from those emails. Numerous emails expressed his unhappiness about not getting his visits and asked Heather to contact the visitation supervisor to arrange visitation per court order. In one email (date unclear) Ronald wrote, "Thank you for being so stupid as to publish your contempt again in a message on the eve of the pretrial hearing. You better get a new lawyer . . . quickly[.]" In another email (date unclear) he wrote, "Are you still functioning under the delusion that you have ANY choices remaining. You will be convicted of multiple criminal contempt charges you sick fuck. You will not recognize your life soon. Thank God and the law that your time has come." On January 10, 2017, he wrote,

> I think you should know that I am NEVER going away. NEVER going to quit. . . . Psychiatric communities and Child advocates and Courts have clearly defined your conduct as child abuse. . . .
>
> . . . .
>
> . . . You are not smart enough to conjure up this legal strategy. I know that this is [your lawyer] and she will answer to the Council for Discipline and God. I[']m not sure which is worse. . . .
>
> Of course, you will say that [the children] only behave badly towards me. But, noone [sic] believes that. It[']s like raising fire breathing dragons and then naively believing that you can AIM them at me. Their lives and personalities are being manipulated and changed by your unending campaign and your perception of your selfish entitlement. These are the effects of the Judges [sic] ruling by awarding a mentally unstable alcoholic the total control of children believing that it was in the best interest of the children. The Best Interest justification has destroyed our children[']s childhood and left the children and I in a legal black hole. I should have committed a crime that would have involved CPS and Juvenile court. At least under such severe circumstances my visitation successes at Better

> Living would have led to normal parenting time within a year or less and the State would have paid the bill. . . .
>
> . . . .
>
> I don[']t see a negotiation with you would be effective, safe or sincere. You should lose the privilege of parenting children at least. . . . I will always encourage and facilitate a healthy relationship with you. I will teach forgiveness and understanding.

On March 5 he wrote, "You obviously are encouraged by an unethical and dishonest attorney. Perfect match considering you are the same. Again. I intend to see that you are punished and prevented from repeating the conduct that is so well documented. I am just getting started. But, feel free to keep digging." On March 10, Ronald sent Heather a link to a Youtube video titled "Parent Alienation Syndrome OR Narcissistic Personality Disorder" and wrote, "Eventually you will face that what you are doing is typical behavior of a disturbed personality who has demonstrated a lack of empathy or understanding of the unnatural harm and stress that you are causing the children." He goes on to talk about traits associated with borderline narcissistic personality disorder, her "victim act," and the "brainwashing of the children." He then wrote, "The court must give custody to me for two important reasons; the children will not heal under your control and I will encourage a healthy relationship with you. There is no other choice and it is too late to distract the court or manipulate the narrative from the clear and overwhelming amount of evidence." On March 12 he wrote, "I am sorry that you feel the way you do. I can accept your faulty perception of me. I have no right to control how you see me. You are entitled to your reality. Your anger is not my responsibility."

When asked if he believed those communications he sent to Heather were courteous, Ronald said, "I believe they're blocked, I don't think she reads them anyways." When asked again if he believed that they were courteous, he said "They're truthful." When asked if he believed they were civil, he said, "Yes, I do."

Heather testified that her communication with Ronald "is limited to his intimidation and threats via email and text messages, and I do not respond to those. And in light of the way he communicates with me, it is difficult to communicate with him." When asked what her ideal outcome was as far as communication provisions of a parenting plan, Heather said, "Well, my ideal outcome is that [Ronald] would learn to be appropriate with other people, and that we could just have a regular visitation schedule, like most divorced couples do. Unfortunately, we're not in that situation." She also believed that if Ronald could "keep on topic," it would be possible to coparent, but she does not believe he can "keep it on topic."

When asked what the most concerning behavior of Ronald had been since the divorce, as it relates to the children, Heather said, "I suppose it's the emotional trauma that he will put them through."

> [F]or example, my daughter . . . performs at the playhouse, and last summer [2016] she invited her father to come see her perform, and he denied her several times, told her he wouldn't come. She would call back, crying. Finally he told her that he would make a deal with her, if mommy would [allow Gilming to supervise a particular visit], then he will come see her play. It's just emotional manipulation that's not an appropriate way to deal with children.

- 11 -

(Heather said she was privy to the statement where Ronald tried to make a deal because he was on speaker phone.)

Heather thinks supervised visits should continue because Ronald has "a hard time controlling his behavior," meaning "[a]nger, knowing the right and appropriate things to say, controlling his tongue, keeping adult things adult." She said it has been 3 years since Ronald has spent "significant time" with the children"; they have grown and they have "some anger." She believes that there needs to be a therapeutic component to rebuilding the relationship between Ronald and the children. Ronald's parenting time "should grow with the children's comfort with him."

Keeping the evidence and the legal principles governing custody in mind, we find the district court did not abuse its discretion in finding that Ronald failed to prove a material change in circumstances warranting a custody modification. There were parent-child relationship issues warranting supervised parenting time for Ronald when the marriage was initially dissolved, and there was insufficient new evidence to suggest Ronald's relationship with his children had materially changed since the initial decree and that he should have custody rather than Heather. Much of Ronald's evidence focuses on what he believes to be parental alienation behaviors by Heather. And while this court takes seriously claims of parental alienation, the record before us does not support such a finding.

Ronald claims that Sam, in particular, has made several comments that seem unusual coming from someone his age (i.e. "you kidnapped me"; you use "meth"; you are a "stalker"); these types of comments could suggest an inappropriate attempt to influence Sam's perception of his father, or at a minimum, the presence of inappropriate comments made to Sam or in his presence. However, neither Dr. Love nor Keady, the only two witnesses who actually worked with the children in a therapeutic setting, said parental alienation was present in this case. In fact, both said that Heather responded appropriately when the children made negative comments about Ronald. We recognize that a parent may respond more appropriately in a therapeutic setting; however, our consideration of the entire record does not compel a different conclusion. This is not to say there was no evidence of possible alienating conduct. For example, there are recordings of conversations between Ronald and Grace which suggest some alienating conduct by Heather. In April 2015, Grace suggests Heather makes Sam dislike Ronald by making up bad things about Ronald, such as Ronald being a drug addict, or that Ronald's girlfriend is replacing Heather as Sam's mother. A month later, Grace indicates Heather would not allow Grace to go to Sam's school concert because Grace had told Ronald about the concert. If true, such conduct by Heather is troubling, and if the record contained evidence of such behavior on an extended basis, the outcome of this case may have been different. However, based on the record before us, Ronald failed to meet his burden of proving parental alienation, and therefore, such allegations cannot constitute a material change in circumstances warranting a change in custody. Furthermore, none of the witnesses testified that Ronald should have custody; not Dr. Montoya, not Dr. Love, not Keady.

As an alternative to modifying custody, Ronald sought unsupervised parenting time with his children. Based on the evidence already discussed above, we can find no abuse of discretion in the district court's finding that Ronald failed to prove a material change in circumstances warranting a change in his supervised parenting time. While the record before this court did not

provide much detail as to the reasons why supervised parenting time was ordered in the initial decree, there was nevertheless substantial evidence to show ongoing parent-child conflicts and troubling relationship issues. In order to establish a material change in circumstances which would support the modification of parenting time from supervised to unsupervised, the evidence would necessarily have to reflect improvement in Ronald's ability to provide a safe and stable environment for unsupervised parenting time consistent with their best interests. See *Fine v. Fine*, 261 Neb. 836, 626 N.W.2d 526 (2001) (while noting parent had taken some steps to address certain problems, and also noting there was no evidence the parent would intentionally harm the children, supervised visitation was necessary until parent could provide safe and stable environment for children consistent with their best interests). The record does not demonstrate that Ronald can provide a safe and stable environment for his children consistent with their best interests at this time.

## 2. CHILD SUPPORT

In its child support calculation attached to the April 20, 2017, modification order, the district court attributed to Ronald a total gross monthly income of $2,833.33 per month ($2,281.84 net monthly income). Paragraph A of the order addressed custody and supervised parenting time, and made Ronald responsible for all costs associated with the supervised parenting time. Paragraph B of the order set child support for two children at $761 per month, commencing December 1, 2014. In paragraph H of the order, a judgment was entered against Ronald in the amount of $1,792.83 for past due child care and medical costs, and further ordered him to pay half the medical costs above $480 per child per year. Paragraph I states that Ronald "shall pay a minimum of [$50] per month in addition to his child support and other financial obligations for the support of the minor children until such time as the judgment against him is paid in full." We note that at oral argument in this case, it was suggested by Heather's counsel that the payment of the additional $50 per month included payment towards Ronald's retroactive support. Further, in Heather's brief to this court, she asserts, "The lower court did not order the retroactive child support to be paid in full immediately, but rather ordered his new monthly child support to include a small amount towards the retroactive support." Brief for appellee at 19-20. However, if it was the intent of the district court to include retroactive child support as part of the $50 monthly payment on the judgment addressed in paragraph I, that is not what is reflected in the modification order or elsewhere in the record before us.

Ronald does not claim that the total monthly income attributed to him was in error. Rather, he claims that payment of $761 per month for child support retroactive to December 2014, along with one-half of the health care expenses, and "$1,083.00 per month for visitation - five hours per week at a cost of $50 per hour" will leave him with "less than $482.84 on which to live." Brief for appellant at 47. He contends the district court should have allowed some type of downward deviation from the child support guidelines pursuant to basic subsistence principles. Ronald claims he "clearly does not have the ability to pay retroactive support." *Id*. at 48.

Generally, child support payments should be set according to the Nebraska Child Support Guidelines, which are applied as a rebuttable presumption. *Freeman v. Groskopf*, 286 Neb. 713, 838 N.W.2d 300 (2013); Neb. Ct. R. § 4-203 (rev. 2011). However, a parent's support, child care, and health care obligation shall not reduce his or her net income below the minimum of $1,005 net

monthly for one person (in 2017), or the poverty guidelines updated annually in the Federal Register by the U.S. Department of Health and Human Services under authority of 42 U.S.C. § 9902(2), except minimum support may be ordered as defined in § 4-209 [$50, or 10 percent of the obligor's net income, whichever is greater, per month]. Neb. Ct. R. § 4-218 (rev. 2017). A deviation in the amount of child support is allowed whenever the application of the guidelines in an individual case would be unjust or inappropriate. *Pearson v. Pearson*, 285 Neb. 686, 828 N.W.2d 760 (2013). Deviations from the guidelines must take into consideration the best interests of the child. *Id.*; § 4-203.

(a) Supervised Parenting Time Costs

Ronald contends that the cost of supervised parenting time should be factored into a downward deviation for child support. He suggests this could be done "dollar for dollar" in reducing his child support, or alternatively, by including the cost of supervised parenting time as support for the children in the child support worksheet. He argues this would be "fundamentally fair and consistent with due process and Nebraska minimum subsistence requirements." Brief for appellant at 47.

While the Nebraska Child Support Guidelines require consideration of the paying parent's obligation for certain other costs beyond monthly child support to keep the paying parent above the poverty level noted above, supervised parenting time is not identified as such a cost. Neb. Ct. R. § 4-218 states that a "parent's support, child care, and health care obligation shall not reduce his or her net income" below the poverty level established by the federal poverty guidelines. Costs incurred for supervised parenting time cannot be characterized as support, child care, or health care.

Further, a dollar-for-dollar reduction would result in the children receiving no child support from Ronald, and including such costs in the child support worksheet would likewise significantly minimize Ronald's child support obligation. A custodial parent receiving substantially reduced or no child support is contrary to the children's best interests; a custodial parent has fixed and constant expenses in raising children. See *Pearson v. Pearson, supra*. Ronald's unwillingness to accept the advice of mental health and family counseling professionals as to how to move forward in building relationships with his children has clearly impacted his inability to eliminate supervised parenting time. The district court did not abuse its discretion by not allowing a downward deviation in child support for these costs.

(b) Retroactive Support

Ronald argues that the district court abused its discretion in awarding retroactive child support because he "clearly does not have the ability to pay retroactive support." Brief for appellant at 48.

In determining whether to order a retroactive modification of child support, a court must consider the parties' status, character, situation, and attendant circumstances. *Johnson v. Johnson*, 290 Neb. 838, 862 N.W.2d 740 (2015). Absent equities to the contrary, modification of a child support order should be applied retroactively to the first day of the month following the filing date of the application for modification. *Id.* The children and the custodial parent should not be

penalized by delay in the legal process, nor should the noncustodial parent gratuitously benefit from such delay. *Id.*

However, the ability to pay is an important factor in determining retroactive child support. See *Freeman v. Groskopf, supra*. And in the absence of a showing of bad faith, it is an abuse of discretion for a court to award retroactive child support when the evidence shows the obligated parent does not have the ability to pay the retroactive support and still meet current obligations. *Id.*

In its April 20, 2017, modification order, the district court ordered Ronald to pay child support in the amount of $761 per month, commencing December 1, 2014 (which was the first day of the month following Heather's November "cross complaint" seeking modification of child support). The modified child support amount is an increase of $548.60 per month over the $212.40 per month ordered at the time of the amended decree. Given that child support is due on the first day of each month, Ronald would owe retroactive support for 29 months (December 2014 through April 2017). Thus, Ronald's retroactive child support obligation is $15,909.40 ($548.60 per month x 29 months). Although, as noted above, Heather's counsel suggests this retroactive child support judgment is included in the $50 monthly payment set forth in Paragraph I, we do not agree the language covers this separate child support judgment. Paragraph I states that Ronald "shall pay a minimum of [$50] per month in addition to his child support and other financial obligations for the support of the minor children until such time as the judgment against him is paid in full." Paragraph I states that the $50 monthly payment is in addition to his child support. As a result, it appears the retroactive child support would be due in full immediately. And there is no evidence that the district court considered Ronald's ability to immediately pay and bring current the retroactive child support judgment of $15,909.40.

In the order of modification, the district court attributed a net monthly income of $2,281.84 to Ronald. After subtracting his monthly child support obligation of $761, and his $50 monthly payment on the judgment against him for past due child care and medical costs, Ronald has $1,470.84 left per month for his personal needs and expenses. The 2017 basic subsistence minimum was $1,005 per month. See § 4-218 (rev. 2017). Accordingly, Ronald has only $465.84 per month that can be considered when determining an appropriate monthly payment on the retroactive support judgment, along with his obligations for health care costs for the children. See § 4-218. We remand the matter of retroactive child support back to the district court for consideration of Ronald's ability to pay such support, either immediately or in installments, and keeping in mind the basic subsistence limitation.

### (c) Tax Exemption

Ronald argues that "fairness" dictates that he be awarded one income tax exemption while there are two minor children and that the parties should alternate the exemption when there is only one minor child dependent upon them. Brief for appellant at 48. An award of a child dependency exemption is reviewed de novo on the record for an abuse of discretion. See *Anderson v. Anderson*, 290 Neb. 530, 861 N.W.2d 113 (2015). In general, the custodial parent is presumptively entitled to the federal tax exemption for a dependent child. *Id.* We find no abuse of discretion in the court's decision to award the child dependency exemptions to Heather.

## 3. Contempt

Ronald claims the district court erred in not finding Heather in contempt for denying him court-ordered parenting time. When a party to an action fails to comply with a court order made for the benefit of the opposing party, such an act is ordinarily a civil contempt, which requires willful disobedience as an essential element. *Hossaini v. Vaelizadeh*, 283 Neb. 369, 808 N.W.2d 867 (2012). "'Willful' means the violation was committed intentionally, with knowledge that the act violated the court order." *Id.* at 376, 808 N.W.2d at 873. Civil contempt must be proved by the complainant by clear and convincing evidence. See *Martin v. Martin*, 294 Neb. 106, 881 N.W.2d 174 (2016).

In his brief, Ronald specifically refers to January through August 2016, and January through February 2017, as periods of time during which Heather violated the court-ordered parenting time. The terms of the April 2014 amended decree would have been in effect, and it states:

> It is in the best interest of the minor children . . . that [Heather] be awarded sole physical and legal custody, subject to supervised parenting time with [Ronald] as outlined in the parenting plan received by the Court as exhibit 5. The Court finds that Corey Densberger, Wendy Gilming, and Better Living are approved persons/entities to supervise the visitation at the time of trial. Such supervised visitation shall take place every Saturday from noon until 5:00 pm, unless the children have other activities scheduled for that day, in which case the supervised visitation shall occur on Sunday at the same time.

Incorporated by reference in the decree and amended decree was a "proposed parenting plan" which states in relevant part, "[Ronald] shall have reasonable rights of parenting time with the minor children as supervised by a mutually acceptable adult other that [Heather] a minimum of twice a month. [Ronald] is responsible for arranging visitation with the supervisor, and the supervisor shall contact [Heather] to arrange parenting time."

In August 2016, the court ordered that Pathfinders shall supervise visits with Ronald and the children.

### (a) January Through August 2016

During her June 2016 testimony, Heather said that she had stopped visits, and the last visit was in January 2016. She "could no longer agree to [Gilming] being the supervisor," and that was at the recommendation of the children's therapist. Heather acknowledged that the amended decree approved Gilming as a supervisor at the time of trial, but noted that it also said as "outlined in parenting plan," and the parenting plan said "a mutually agreeable person." Heather, through her counsel, notified Ronald, through his counsel, that Gilming was no longer approved, but that the Pathfinders and Better Living agencies would be approved; Densberger was also a mutually agreed supervisor at the time of the divorce trial. Heather said she had not been contacted by anyone other than Gilming seeking to arrange visitation.

Exhibit 22, text messages between Heather and Gilming, was received into evidence without objection. The messages show that on January 8, 2016, Heather told Gilming that she did not agree to having Gilming as a supervisor any more, and that, "If Ron would contact Better Living or Pathfinders, I will work with them to get something arranged." Although Gilming

- 16 -

continued to message Heather in an effort to arrange visits, Heather told her again on March 30 and May 19 that if Ronald wanted to contact Pathfinders or Better Living, she would be "happy" to set up visits.

Based on our de novo review of the record, we cannot say that Heather was willfully disobeying a court order from January to August 2016. The evidence reveals that she was not unwilling to give Ronald his court-ordered visitation, she was just unwilling to have Gilming supervise those visits. And there is some indication from the parenting plan attached to the decree that visitation was to be supervised by a "mutually acceptable adult." Heather expressed a willingness to work with either Pathfinders or Better Living, but no one other than Gilming contacted her to arrange visits. Accordingly, the district court did not abuse its discretion when it found that Ronald failed to prove Heather was in contempt as to this period of time.

(b) January Through February 2017

In April 2017, Ronald testified that he had only seen his children two times in the last 2 months. He said that at the January 20 meeting with Heather and Keady there was discussion about discontinuing family therapy, but there was no discussion about discontinuing visits. It was a "disappointment" when Heather stopped the visits; visits resumed 2 weeks ago when "allowed" by Heather. Ronald thought filing a show cause contempt motion "might have helped start the visits again."

During her April 2017 testimony, Heather said that Ronald had scheduled parenting time on a weekly basis. After a consultation with Keady in January, she skipped the following visit based on his recommendation that the visits were also traumatic. Then Ronald was in Arizona the following week. They did a visit a week later, which was "also a traumatic visit," so she decided to follow Keady's recommendation that once a month was probably appropriate. She said that at the January meeting, after Ronald left the room, Keady told her it would be his recommendation that visits go to once a month until such time that it was a less traumatic experience for the children; it was Heather's understanding that Keady would be communicating that to Ronald, and then she communicated with Pathfinders and her attorney. Her attorney advised that it would be prudent to follow Keady's recommendations. The transcript reflects that on February 8, Heather filed a motion to modify Ronald's parenting time to once per month.

Exhibit 84 was received into evidence without objection. It contains a text message from Shannon Conway at Pathfinders to Ronald on January 21, 2017, stating, "Heather said that the therapist has recommended stopping therapy and visits so she will not be bringing the kids today." The exhibit also contains an email exchange between Keady and Ronald. Ronald informed Keady that "Heather told Pathfinders that you recommend cancelling court ordered visits. She [cannot] and you [cannot] recommend that." Keady responded, "The only recommendation I made was that family therapy will stop based on Ron, Heather and this therapist['s] agreement (1/19/2017) that [t]he process of family therapy is traumatic for Grace and Sam. Recommendations regarding Court ordered visits are outside my role as family therapist."

Keady testified that after the family therapy sessions ended, he met with Ronald and Heather to share his assessment that the therapy sessions were not productive, and Keady felt that they were traumatic for the children. When asked if he also discussed with Ronald and Heather

that the supervised visits may be traumatic for the children as well, Keady responded, "Yes, if [Ronald] was interacting in a controlling or aggressive manner."

Heather said they tried to schedule a visit the first couple of weekends of March, but there were scheduling conflicts with the supervisor. The third weekend in March the supervisor had to cancel for a family emergency. Then there was a visit the last weekend in March.

Based on the record before us, it is clear that from January 20 through the end of February Ronald did not get all of his court-ordered visitation. However, it is not clear that Heather willfully disobeyed the court order. Despite the inconsistency as to what Keady's recommendation, if any, was regarding visits, Heather testified that she was relying on a conversation she had with Keady that visits should be reduced and advice from her attorney that it would be prudent to follow Keady's recommendation. Heather's reliance on professional advice for a brief temporary cessation of parenting time out of concern for the children's mental health was not unreasonable. Accordingly, the district court did not abuse its discretion when it found that Ronald failed to prove Heather was in contempt as to this period of time.

### 4. Fair Process

Ronald claims that the process was "fundamentally unfair" and that the matter should be remanded so that he may have a fair trial. Brief for appellant at 48. His specific claims are that the court made rulings prior to reviewing all of the evidence, and that evidentiary hearings, closing arguments, and the court's findings were had off the record and/or out of the presence of the parties.

### (a) Review of Evidence

Ronald argues that the Court made rulings prior to having reviewed all of the evidence, specifically exhibit 102, the 2½-hour CD (recording of two sessions between Heather, Ronald, and Keady) that was offered and received by the Court. He claims:

> Proceedings ended at 3:30 p.m., oral arguments were heard in chambers . . . pronouncement of findings and orders were made in chambers . . . with an order to be submitted all before the 4:30 close of the judicial day on April 4, 2017. Therefore, the trial court did not review Exhibit 102[.]

Brief for appellant at 49. Although Ronald claims that that the foregoing events occurred "all before the 4:30 close of the judicial day" on April 4, there is nothing in our record to show what time the in-chambers proceedings concluded. Even if the court did not fully review exhibit 102 prior to making preliminary findings or giving directions to counsel to draft a proposed order, that does not mean that the court did not review and consider the exhibit before the modification order was filed on April 20.

### (b) Proceedings and Findings Off Record

The Nebraska Supreme Court has made it clear that its rules require the district court to provide a court reporter whenever a litigant requests one. See *Kennedy v. Kennedy*, 221 Neb. 724, 380 N.W.2d 300 (1986). "The rules relating to official court reporters provide that the court reporter shall make a verbatim record of 'the testimony or other oral proceedings,' regardless of

whether a request has been made by the court, counsel, or any party." *Gerdes v. Klindt's, Inc.*, 247 Neb. 138, 140, 525 N.W.2d 219, 221 (1995) (citing to Neb. Ct. R. of Official Ct. Rptrs. 4b(2) (rev. 1992)). However, records of pretrial and posttrial matters are made only at the request of counsel. *Gerdes v. Klindt's, Inc., supra.*

Neb. Ct. R. § 1-203 (rev. 2010) states that court reporting personnel must comply with any Nebraska Supreme Court rule relating to official court reporters and have a duty to make "a verbatim record of all proceedings in the court to which they are appointed in accordance with Neb. Ct. R. App. P. § 2-105." Neb. Ct. R. App. P. § 2-105(A) (rev. 2010) states:

(1) "Court reporting personnel," . . . shall in all instances make a verbatim record of the evidence offered at trial or other evidentiary proceeding, including but not limited to objections to any evidence and rulings thereon, oral motions, and stipulations by the parties. This record may not be waived.

(2) Upon the request of the court or of any party, either through counsel or pro se, the court reporting personnel shall make or have made a verbatim record of anything and everything said or done by anyone in the course of trial or any other proceeding, including, but not limited to, any pretrial matters; the voir dire examination; opening statements; arguments, including arguments on objections; any motion, comment, or statement made by the court in the presence and hearing of a panel of potential jurors or the trial jury; and any objection to the court's proposed instructions or to instructions tendered by any party, together with the court's rulings thereon, and any posttrial proceeding.

Ronald argues the "court appears to have held evidentiary hearings, some after trial commenced where affidavits were offered and received, off the record such that there is not a proper record for appeal." Brief for appellant at 49.

We have reviewed the judge's notes generally referenced in Ronald's briefs. The entries relate to things like motion hearings and status hearings that did not require a verbatim record unless requested. See § 2-105(A)(2)

We briefly address one specific "hearing" on March 24, 2017, referenced by Ronald. Initially, on March 16, an on-the-record hearing was held regarding Heather's February 2017 motion to modify parenting time to once per month and a motion to discontinue family therapy. Keady was testifying, and because the court had another matter to attend to, a recess was taken. The bill of exceptions from the March 16 hearing states, "A recess was taken at 2:10 p.m., and the matter was then continued to March 24, 2017, at 10:00 a.m., and to be held on affidavits." The bill of exceptions before us does not contain a hearing from March 24. An entry from "Judge[']s Notes" on that day states: "Attorneys [for Heather and Ronald] present. Motion to compel sustained. [Ronald] to comply within 10 days." Attorney [for Heather] to submit proposed order." There is no evidence that an evidentiary hearing actually occurred on March 24 or that affidavits were, in fact, received. Accordingly, this too appears to have been a motion hearing that did not require a verbatim record unless requested. See § 2-105(A)(2). We note that trial resumed less than 2 weeks later, on April 4, at which time Keady was among the witnesses that testified. The matter was submitted on April 4, and the modification order addressing parenting time was filed on April 20.

Ronald further argues that "[t]here were no stipulations that closing arguments be held off the record, but closing arguments were held off the record and out of the presence of the parties." Brief for appellant at 49. The conduct of final argument is within the discretion of the trial court, and a trial court's ruling regarding final argument will not be disturbed absent an abuse of discretion. *Schriner v. Schriner*, 25 Neb. App. 165, 903 N.W.2d 691 (2017). Additionally, § 2-105(A)(2), set forth previously, requires that a verbatim record of "arguments" be made only upon request.

After both parties were finished presenting their evidence, the court said, "All right, why don't we take a recess. *Unless you want closing arguments on the record, I'll see counsel in chambers*. Let's take about a 10-minute break and you can collect your thoughts and take a break, and then I'll hear arguments from counsel." (Emphasis supplied.) There is no indication on the record before us that either party requested to have closing arguments on the record. See *Kennedy v. Kennedy*, 221 Neb. 724, 380 N.W.2d 300 (1986) (trial court was required to provide court reporter to make verbatim recording of closing arguments in custody hearing upon request by counsel). Nor is there any indication that Ronald objected to having arguments in chambers. Generally, failure to make a timely objection waives the right to assert prejudicial error on appeal. *Jacobson v. Shresta*, 288 Neb. 615, 849 N.W.2d 515 (2014).

Finally, Ronald argues the court's findings and orders were announced immediately, and were off the record and out of the presence of the parties. An entry from "Judge[']s Notes" for April 4, 2017, states: "[Heather] present with [her] Attorney . . . . [Ronald] present with [his] Attorney . . . . Hearing held and evidence adduced. Matter argued and submitted. [Heather's attorney] to submit proposed order." Given that Heather's attorney was to submit a proposed order, the court must have made preliminary findings or gave counsel directions after closing arguments were had in chambers. While the court's findings and directions may have been orally given in chambers, there is no requirement that they be orally given at all. The court could have simply waited to issue a written order on its own accord. Accordingly, we find no error in the court's orally giving its preliminary findings or directions off the record and/or in chambers. The court filed its written order of modification on April 20.

## VI. CONCLUSION

On the issue of retroactive child support, we remand the matter back to the district court with directions as set forth above. In all other respects, we affirm the district court's modification order.

AFFIRMED IN PART, AND IN PART
REMANDED WITH DIRECTIONS.