DIANA ELLEN SMITH-HELSTROM, FORMERLY KNOWN AS DIANA ELLEN YONKER, APPELLANT, V. DAVID LOREN YONKER, APPELLEE.

569 N.W.2d 243

Filed October 10, 1997.   No. S-96-923.

Michael E. Piccolo, of Clough Dawson & Piccolo, and Katherine Karuschkat, P.C., for appellant.

Jeffrey M. Wightman and James E. Doyle IV, of Cook, Wightman & Doyle, for appellee.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.

PER CURIAM.

In this second appearance of this dissolution action, the petitioner-appellant mother, Diana Ellen Smith-Helstrom, formerly known as Diana Ellen Yonker, urges that the district court erred both by ending the supervision ordered in *Smith-Helstrom v. Yonker*, 249 Neb. 449, 544 N.W.2d 93 (1996), of the visits between the respondent-appellee father, David Loren Yonker, and the parties' son, Michael Douglas Yonker, and by setting the father's child support obligation at an inadequate amount.

In *Smith-Helstrom, supra*, we held that the care, custody, and control of the son be placed in and with the mother, subject to reasonable, supervised visitation by the father. We further directed that the district court establish a schedule for visits between the father and son to take place in or near Englewood, Colorado, that such visits be conducted in the presence of a third party in such a manner that the father could not again abduct the son, and that the district court set an appropriate amount of child support based on the father's earning capacity.

Our opinion was filed on March 1, 1996, and the father returned the son to the mother the next day. In May, he began making voluntary child support payments of $190 per month, based on his $12,000 yearly income.

Pursuant to the father's motion for temporary visitation, the district court ordered supervised visitation to take place at the Arapahoe County Airport in Englewood, Colorado, beginning no later than May 31, 1996. However, the first supervised visi-

tation did not take place until June 17, and not at the airport, but at the Bethesda Children's Services of Behavioral Health Services.

The mother begins her challenge to the district court's termination of the supervision of the father's visitations with the contention that it lacked the power to do so.

It is true that when a cause is remanded with specific directions, the court to which the mandate is directed has no power to do anything but to obey the mandate. The order of the appellate court is conclusive on the parties, and no judgment or order different from, or in addition to, that directed by the appellate court can be entered by the trial court. *Xerox Corp. v. Karnes*, 221 Neb. 691, 380 N.W.2d 277 (1986); *Gates v. Howell*, 211 Neb. 85, 317 N.W.2d 772 (1982). When an appellate court remands a cause with directions, the judgment of the appellate court is a final judgment in the cause, and the entry thereof in the lower court is a purely ministerial act. No modification of the judgment so directed can be made, nor may any provision be engrafted on or taken from it. That order is conclusive on the parties, and no judgment or order different from, or in addition to, that directed by it can have any effect, even though it may be such as the appellate court ought to have directed. *K N Energy, Inc. v. Cities of Broken Bow et al.*, 248 Neb. 112, 532 N.W.2d 32 (1995).

However, the right of visitation is subject to continuous review by the court entering the dissolution decree, and a party to a dissolution action may file a motion to modify a visitation order on the grounds that there has been a material change in circumstances. See, *Murdoch v. Murdoch*, 206 Neb. 327, 292 N.W.2d 795 (1980); Neb. Rev. Stat. § 42-364(1) (Cum. Supp. 1996) ("[s]ubsequent changes [in visitation] may be made by the court after hearing on such notice as prescribed by the court"). Here, the district court initially entered an order for visitation consistent with our mandate in *Smith-Helstrom, supra*. Only after the father filed motions to terminate supervised visitation and to establish immediate extended summer visitation in Nebraska did the district court depart from the mandate under its continuing jurisdiction over the matter of visitation. It thus cannot be said that the district court acted beyond its powers.

Next, the mother contends that the district court wrongly ordered that the father have unsupervised visitation one weekend per month, 6 weeks of every summer, alternating Thanksgivings, and half of Christmas vacations. A party seeking to modify a marital dissolution decree concerning custody, support, or visitation of a child has the burden to show a material change of circumstances affecting the best interests of the child. *Schmale v. Schmale,* 240 Neb. 499, 482 N.W.2d 268 (1992).

According to the father, the son was very warm, loving, and happy to see him at the June 17, 1996, visitation. The two played together, and when the visit ended, the son kissed and hugged the father and said, " 'I love you.' " The second supervised visitation took place on June 24. Again, the son was glad to see his father. They played games and the son was comfortable with, and affectionate toward, his father. The third visitation took place on July 3. This time, too, the father found the son to be very affectionate and warm. Prior to the third visitation, the father became aware, through a response to a motion filed by the mother, that the son had been soiling himself, having nightmares, not sleeping well, and stealing money from the mother. When the father questioned the son about these matters, the son stated that he had had two nightmares about spiders after watching the movie "Arachnophobia," but denied stealing money from the mother.

The father believes that the son's present environment is creating problems and that he needs to "be brought back to the environment that he did so well in." The father testified that the son misses his friends in Nebraska and that the father's activities with the son are very limited at the supervised visitations.

Christa Geyer, the director and visitation coordinator of the Bethesda campus, supervised three visitations between the father and the son at the campus. For each visit, Geyer met alone with the father for approximately 15 minutes prior to the visitation and then met alone with the son for 15 minutes after the visitation. In addition, she observed the visits through a window and listened via a microphone. Geyer stated that the son never displayed any signs of withdrawal, fear, or anxiety at any of the visits. She stated that the visits, which lasted 1½ hours and took place in a large room, went well. The son was affec-

tionate toward the father, the two played games, and the scheduled terminations of the visits were interruptive in that their activities could have naturally continued beyond that time. Geyer, who supervises over 20 visitations per week and has done so for over 18 years, is of the opinion that the son would benefit from more time with the father.

Although the father testified that the mother refused to deliver the son to the airport for the first supervised visitation, other evidence shows that it was the Bethesda facility, not the mother, which decided not to conduct the visitation at the airport. The father requested that the second and third visitations take place at the airport for the sake of convenience and because he and the son enjoyed watching the airplanes; not as a means of making it easier to abduct the son, as he had no intention of doing so. At the time of trial, the parties had arranged a fourth supervised visitation to take place at the airport.

The mother fears that the father will again abduct the son if the visitations are unsupervised. She testified that the son becomes angry and "physical" after the visitations and that such behavior is uncommon for him. Following the most recent visit, the son accidentally dropped a Lego model he had built with his father at the visit and became very upset. According to the mother, the son stated that when he lived in Nebraska, he was instructed not to disassemble the Lego models because they cost too much, and was afraid that he would now be in trouble. The mother also testified that the son did not complain about nightmares prior to the supervised visitations; that he has, on two recent occasions, experienced problems "controlling himself"; and that since his visitations, he cries a lot and is very emotional. Further, the mother testified that the son is nervous prior to the visits and seems concerned about her arriving on time.

Philip Madonna, a clinical social worker licensed to practice psychotherapy in Colorado, has been treating the mother for the past 2 years and has been providing therapy for the son since March 1996. The record does not reflect how many times Madonna has met with the son, but according to Madonna, the son's abduction and sudden return to Colorado caused him to become "very clingy with his mother, very fearful if he would go away, suddenly something would happen to him again and

she wouldn't be there for him." According to Madonna, the son has trouble sleeping, experiences frequent nightmares, acts out aggressively, and is "pooping his pants at night." Madonna attributes these behaviors and problems to the visitations. However, the son has told Madonna that he wants to see his father and that he is happy to see his father.

Nonetheless, Madonna is of the opinion that unsupervised visitation is not desirable, and is of the view that the son's behavior indicates that he does not feel safe during the visitations and that he unconsciously fears being taken away from the mother again. He also is of the view that the son should not see the father as frequently as three times over a 2-week period and that one visit a month is more appropriate. Furthermore, Madonna is of the opinion that it is not in the son's best interests to visit the father for an extended summer visitation.

Wanda L. Kjar, the father's fiance, testified that the father and the son have an excellent relationship and that her three boys get along well with the son. According to Kjar, the son enjoys being with the father, and it is in the son's best interests for the father to have extended visitations during the summer.

The district court found that

> supervised visitation and visitation in the State of Colorado is no longer necessary. The visits have gone extremely well. The [son] clearly wants to visit with his father. There is no danger that the [father] will "abduct" the minor son and no further reason to limit visitation to Colorado. The Court specifically finds that continued supervised visitation, at this point, is unnatural and is detrimental to the well-being of the minor [son]. . . . This Court finds that it is clearly in the minor [son's] best interest to have expanded visitation with the [father].

Modification of a dissolution decree, child visitation, and amount of child support are matters initially entrusted to the discretion of the trial court, whose decisions are to be reviewed on appeal de novo on the record and will be affirmed absent an abuse of discretion. See, *Adrian v. Adrian*, 249 Neb. 53, 541 N.W.2d 388 (1995); *Evenson v. Evenson*, 248 Neb. 719, 538 N.W.2d 746 (1995); *Rosse v. Rosse*, 244 Neb. 967, 510 N.W.2d

73 (1994); *Heldt v. Chapman*, 204 Neb. 607, 284 N.W.2d 409 (1979). Although in conducting its de novo review of such matters an appellate court reaches a conclusion independent of the trial court, where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Schuelke v. Wilson*, 250 Neb. 334, 549 N.W.2d 176 (1996).

In the context of marital dissolutions, a material change in circumstances means the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently. *Peterson v. Peterson*, 239 Neb. 113, 474 N.W.2d 862 (1991). Considering the district court's specific finding that the father's evidence was more credible than the mother's, we cannot say it abused its discretion in implicitly finding that the circumstances concerning visitation had changed and in thus terminating supervision of the father's visitations or in its visitation schedule.

As to the matter of child support, Russel Morgan, the owner and president of the First National Bank in Elwood, Nebraska, where the father banks, testified that the father owns and operates a marina year round and that he also operates or leases out a convenience store year round. Thus, according to Morgan, the father does have income over the course of 12 months.

The father testified that his work is year long, that he performs physical labor for about 5½ months, and that the remainder of the time he performs nonphysical labor. According to the father, he chooses not to perform additional physical labor because he needs time to recuperate. However, the father does vacation for an entire month. He and his brother also own a jet ski rental business and a pontoon boat rental business, and plan to open a snowmobile rental business. He testified that his yearly income is approximately $14,000, which takes into account the fact that his corporation pays his mortgage and transportation costs.

Inasmuch as the record contains no countervailing evidence or evidence that the $200 per month of child support ordered does not comport with the Nebraska Child Support Guidelines,

we cannot say that the amount of child support set by the district court constitutes an abuse of discretion.

AFFIRMED.