IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


BECK V. BECK


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


SCOTT W. BECK, APPELLEE,

V.

HEATHER M. BECK, APPELLANT.


Filed January 29, 2019.    No. A-18-013.


Appeal from the District Court for Scotts Bluff County: LEO P. DOBROVOLNY, Judge. Affirmed.

Bell Island, of Island Law Office, P.C., L.L.O., for appellant.

Adam R. Little, of Ballew Hazen, P.C., L.L.O., for appellee.


RIEDMANN, BISHOP, and WELCH, Judges.

BISHOP, Judge.

Heather M. Beck sought to modify the joint legal and physical custody arrangement she and Scott W. Beck had agreed upon with regard to their two minor children when they divorced in 2015; she sought sole custody and a modification of child support. Scott counterclaimed, seeking relief related to the parenting plan and child support. The Scotts Bluff County District Court made some modifications to the original decree, but did not modify the custody arrangement or child support. Heather appeals; we affirm.

BACKGROUND

The parties were divorced by a decree entered on March 5, 2015. The parties stipulated to the terms of the decree, including that they share joint legal and physical custody of their two minor children, Natalie and Silas. Scott was ordered to pay $2,500 per month in child support, and "up to $10,000 per year for the children's private schooling in Colorado." It was anticipated that

- 1 -

Heather and the children "may change their state of residence to the state of Colorado," but prior to any permanent move, an application to the district court had to be made establishing proposed changes in parenting time, costs for transportation, and whether the move was in the children's best interests. The child support worksheets attached to the decree reflected $3,000 in gross monthly income for Heather and $46,000 in gross monthly income for Scott. The child support amount on the joint physical custody worksheet showed Scott owing $3,239 in child support for two children. The decree indicated that a deviation was provided because the child support amount "more than amply provides for the children's needs" and because Scott was agreeing to pay for a substantial portion of the children's private school costs (in Colorado). Scott was also ordered to pay Heather $400,000 to equalize the division of property, and alimony of $500 per month for 18 months. As for parenting time, the parties had agreed that the children would "spend as near as practical 40 percent of each month" with Scott. Scott was to have the children alternating weeks from after school on Thursday until Sunday evening, and alternating holidays. During the summer, Scott was to have parenting time every Thursday commencing at 3:30 p.m. until Sunday at 3:30 p.m. Each parent was also permitted two 1-week blocks of parenting time in the summer upon 21 days of advanced notice to the other parent.

In September 2016, Heather filed a "Motion to Modify," claiming there had been a material change in circumstances warranting modification of custody, parenting time, and child support. She alleged that Scott had "failed to act as a joint custodian, and . . . be responsible for the children," had demeaned her in front of the children regularly, and had "failed to take up his financial obligations." Heather also claimed her income had not increased as expected, while Scott's income had increased; she claimed the change in income would affect child support.

In Scott's "Answer and Counterclaim," he denied Heather's allegations, and sought a "re-examin[ation]" of the parenting plan incorporated into the original decree and to make any changes necessary to enforce the agreement that Scott would have parenting time at least 40 percent of the time each month. Scott further sought an amendment to the parenting plan to address alleged parental alienation or manipulation of the children by Heather, and also requested a modification to child support, noting a decrease in his own income.

Trial took place on July 3, 2017; the parties both resided in Scottsbluff, Nebraska. A guardian ad litem's report dated June 27 was received into evidence; it reflected that Natalie was 10 years old and Silas was 7. The district court entered a "Journal Entry" on December 3. The district court's order indicated that the decree "should be modified due to some changes in circumstances." The modifications included: transfers of custody of the children from one parent to the other would take place at school or at the daycare provider, and the parent from whom custody was being transferred was not to be present at the time of the transfer; Scott's parenting time would take place on alternating Thursdays to the following Tuesday; telephonic or other electronic communications between the parents and children were limited to Monday and Friday from 7-7:15 p.m., parents were prohibited from monitoring the communication, and the children were not permitted to have unsupervised access to cellular telephones or other communication devices; regular counseling for the parents and children was ordered, with written reports to be sent to the court every 90 days; daycare was to be billed directly to the parties in their respective percentage obligations; summer and holiday parenting time superseded any changes in the present

order; and the parties were directed to not modify the parenting time set forth in the decree or the present order, nor were the children permitted to decide if they wished to spend time with a parent.

All other relief requested by either party was denied. Heather appeals from the district court's order.

ASSIGNMENTS OF ERROR

Heather claims, restated, that the district court erred by (1) not finding a material change in circumstances necessitating a change in custody and parenting time, (2) failing to modify child support and other matters related to daycare, education, and medical costs, and (3) granting Scott additional parenting time.

STANDARD OF REVIEW

Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015). Parenting time determinations are also matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Aguilar v. Schulte*, 22 Neb. App. 80, 848 N.W.2d 644 (2014).

An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Schrag v. Spear, supra.* A judicial abuse of discretion requires that the reasons or rulings of the trial court be clearly untenable insofar as they unfairly deprive a litigant of a substantial right and a just result. *Id.*

In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

ANALYSIS

DISTRICT COURT'S DECISION TO MAINTAIN JOINT CUSTODY

Heather claims that the parties' "inability to communicate and make decisions regarding the children's care requires a modification from joint custody to sole custody." Brief for appellant at 9. She contends that either the district court failed to make a finding of a material change in circumstances and should not have modified the decree, or it failed to make a determination that "continued joint custody was in the best interest of the children even though the parties were not able to communicate." Brief for appellant at 21. She suggests that either way, the district court abused its discretion. She argues that the parties are unable to communicate about the children's needs. She points to examples, such as: Scott's failure to communicate with Heather about scheduling counseling appointments for the children; Scott calling her "a bitch, whore, stupid," and saying she is a "bad mother," *id*. at 13; Scott's threat to "take the kids away from her" and saying she "was not good enough to have the kids," *id*; and Scott forcing his way into Heather's house when he was angry the "kids did not want to go for parenting time," and taking Heather's phone, *id*. at 14. Heather claims that "[s]ince communication between the parties has deteriorated

- 3 -

to the extent that nothing can be accomplished, someone must be in charge." *Id*. She contends that since she has been "the person at home for the children and provides for their day to day care," she should be awarded sole legal and physical custody of the children. *Id*.

Heather acknowledges that the trial court's decision will be granted deference, but argues that the court "still must make a finding that joint custody is in the child's best interest." *Id*. She suggests that "[o]ne must assume that there was a possible finding of a change in circumstances affecting the best interest of the children as the court did make some minor modifications to the parenting order." *Id*. at 14-15. However, Heather claims there was no specific finding with regard to whether continued joint custody was in the children's best interests. While it is true that such a finding was not made, it is certainly implied in the court's order since the court left the joint custody arrangement intact. Further, as noted by Scott, Heather did not ask the court to make specific findings of fact, and therefore cannot claim an abuse of discretion on the basis that the court did not do so. See *Schroeder v. Schroeder*, 26 Neb. App. 227, 918 N.W.2d 323 (2018) (in absence of request by party for specific findings, trial court is not required to make detailed findings of fact). Additionally, we review the record de novo and need not rely on the district court's specific findings of fact when considering whether the trial court abused its discretion in reaching its ultimate decision. See *Fee v. Fee*, 223 Neb. 128, 388 N.W.2d 122 (1986) (trial court's statement of its findings of fact and conclusions of law may be helpful in appellate review of equitable action, but absence of such statement by trial court, even when requested, is not prejudicial, because de novo review of record provides for factual findings independent of findings by trial court). Without elaborating, the district court determined there had been a change in circumstances, and we conclude the record supports that determination. Therefore, we now consider the evidence to determine whether the district court abused its discretion by making some modifications to the decree, while maintaining the joint legal and physical custody arrangement initially agreed upon by the parties when they divorced.

A substantial portion of the parties' testimony focused on changes in their daughter's behavior beginning in the summer of 2016; the problems arose during transitions at the commencement of Scott's parenting time. Heather, along with a teacher from the children's school, testified about an incident after school when Natalie did not want to leave with her father. According to the teacher who had taught Natalie "[t]wo years ago," she observed Natalie refusing to get into a vehicle with Scott after school "[p]robably [in] fall of 2016." The teacher said Natalie "did everything in her power to keep from going." She said that Natalie ran and hid in the girls' bathroom and "fought pretty hard." Scott indicated, however, that this incident at school "had other things going on." Scott testified that Heather had bought Natalie a cell phone and Natalie was talking to Heather on the phone while Scott was trying to get Natalie to leave with him. Scott said it took over 45 minutes to get Natalie to go with him. The teacher acknowledged that when Scott tried to calm Natalie down to get her to go with him, he acted appropriately during those "45 minutes or so"; he did not yell at Natalie or try to physically move her from the school.

The teacher also testified that Natalie would talk to her about not wanting to go with her father; this went on for a couple months in the fall of 2016. In 2017, she believed it got better. On cross-examination, the teacher stated she had not observed these kinds of issues with transitions during the 2015-16 school year. The teacher further acknowledged that Scott had talked with her

from time to time about Natalie and her progress, and that he had been an appropriately involved parent.

Heather described a couple other instances in the fall of 2016 when Natalie did not want to go with her father. Heather took some video of these incidents and offered them as an exhibit at trial. One incident occurred after a piano recital when Scott carried Natalie to his truck while she was "throwing a fit and crying and screaming," according to Heather. After being put in Scott's truck, Natalie exited his truck and got into Heather's truck, which is the point captured by the video. The other incident occurred after Silas' football game. The children were "with Scott," but Heather was at the game and Natalie came to sit with her during the game. She told Heather she did not want to go back with her father. Heather testified that she told Natalie she had to go and Natalie "threw a fit and wouldn't go with him." Heather also claimed that on Thursday mornings when Natalie "knew it was Scott's weekend," she "would beg [Heather] not to make her go to school because she didn't want to go with her dad."

According to Scott, with regard to the incident at the football game, he recorded (but did not offer into evidence) some video of what happened prior to the video recorded by Heather. Scott explained that Natalie was "yelling at me and telling me she hated me," and Heather was standing next to her, "laughing at me that I'm recording the video." Scott claimed that Heather told Natalie she could choose whether she wanted to go with Scott or leave with Heather. When Scott told Natalie it was not her decision to make, that triggered Natalie telling Scott she hated him.

We have reviewed the two video clips offered by Heather. They reveal that neither parent can control or console their daughter when she becomes resistant to leaving with her father. In one video, Natalie tells her father that he is mean, that he "hurt mommy," that he is lying, and that he is mean to Heather. Natalie tells her father she hates him. During this time, Heather says absolutely nothing in response to Natalie's accusations against her father. In the other video clip, most of it with just audio, Natalie is having a complete meltdown; she is crying, screaming, and saying, "I'm scared," or "I don't want to go." Heather tells Natalie she is "supposed to go with him," or she needs to go, and says, "I'm sorry, Nat." Heather never tells Natalie that her behavior is inappropriate, nor makes any genuine attempt to calm the histrionics. When Scott asks for her help, Heather simply says, "What am I supposed to do?" Interestingly, when the guardian ad litem asked Natalie why she was scared of being at her father's house, she answered either, "'I don't know,'" or, "'Daddy's mean.'" When asked what it meant to be mean, Natalie said that "he yells," but she could not describe a time when he did that. Natalie also said her mother yells at her, and responded affirmatively when asked if that was scary.

Notably, from March 2015 (divorce) until the summer of 2016, there was no evidence of problems with Natalie not wanting to spend time with her father. And there was evidence that Heather was cooperative and flexible with parenting time arrangements with Scott during that time. Scott started dating someone in late February 2016, and Scott claimed that the problems with Natalie's behavior started in May or June 2016 when Heather found out Scott was taking his girlfriend and the girlfriend's son "to the family branding." According to Scott, Heather was very upset because he was taking somebody else, and their own children were planning on going to the branding. Scott claimed that Heather "felt that the branding and the ranch were kind of her thing and part of her life, and that I was introducing the kids and another woman to something that she loved to do." Up until this time, Heather had been allowing Scott to keep the children longer on

his weekends, as well as provided time with them on Mondays or Tuesdays. Once Scott started dating, Heather stopped letting Scott have the extra time.

Scott also described other instances where plans had been made for him to bring the children over or to go to dinner and "an hour before I go pick up the kids they magically don't want to come with me any more[.]" Scott would learn that Heather "one time gave them a video game before [he] got there and so they didn't want to leave because they wanted to do the video game." Another time, Heather told the children she would take them to a new movie right before Scott arrived, and the children decided they wanted to go to the new movie. On one occasion, Scott went to pick the children up at school and Heather showed up at the transition and told Natalie she could go with her friends and stay the night if she went with Heather. Scott agreed to let Natalie do that, but when he started to leave with Silas, Heather said that if Silas left with Scott, Silas would not be able to go to a birthday party that weekend. Heather testified that she was merely reminding Silas and Scott about the party. And with regard to Natalie spending the night with a friend, Heather claimed it was not her idea, but that is was proposed by a friend's parent.

Heather testified that there was "something going on with Natalie," and Heather did not "know if [it was] very healthy for [Natalie] to be going [to her father's] until we know why she's having so much trouble." Heather acknowledged that when Natalie is crying and unhappy about going with her father, Heather will say, "I'm sorry, I wish you didn't have to go." She explained that she just wanted to let Natalie know that she understood her and her fears. Heather acknowledged that Natalie did not have any problems going to spend time with her father until the summer of 2016. Heather admitted to texting "hurtful things" to Scott, such as calling his girlfriend "a fucking whore," and stating that he is a "pathetic father," and that he should "just leave [Heather] and the kids alone."

Heather claimed she and Scott have had "decision-making problems" since the divorce. She testified about the lack of communication between Scott and her with regard to which therapist the children would see, or about getting medical bills paid, or whether the children should be in public or private school.

Heather's attorney called Natalie to testify in the courtroom. Scott's attorney pointed out that a guardian ad litem was involved in the case, and that "minor children need to be kept out of these things as much as possible." Scott's attorney interposed an objection "to having [a] ten year old daughter appearing in the courtroom with [her] parents." Both parents did exit the courtroom before Natalie testified; therefore, we will not recount her testimony here. We would note, however, that there was nothing in Natalie's testimony to suggest that Scott behaved inappropriately towards her.

According to Scott, 3 weeks prior to trial, Heather disconnected the children's phones from him. He claimed that he and his children would text and call each other daily. But one day, Silas called to tell him that their babysitter was sleeping and they were hungry. Scott contacted Heather and asked if he should go pick up the children from the babysitter. "That afternoon she disconnected the phone from me so that the kids could not text or call me anymore." Scott said that the weekend prior to trial, when he went to get Natalie from Heather's truck, Natalie kept climbing from one side of the truck to the other to avoid getting out. Scott claimed Heather "just sits in the truck and doesn't -- doesn't help, doesn't encourage, doesn't do anything." When he

asks Heather to help, Heather says "she can't help me, that she doesn't want to hurt Natalie." This is consistent with Heather's lack of assistance noted in the videos, which we discussed previously.

A friend of Scott's testified that his wife and Heather grew up together, so he got to know Scott 6 or 8 years ago and they "have been pretty good friends since then." The two families spent time together "probably a couple times a month." Since the parties' divorce in 2015, the friend and his children had spent time with Scott and his children "six, eight times," and at school functions. The friend never observed Natalie to be afraid of her father; he saw her give Scott a hug when he was leaving the school lunchroom, and generally described the children as being "well behaved" around their father and that "they love their dad."

At the close of trial, the district court stated that it had been an interesting observation that "for the really big stuff, . . . the important stuff," the parties were able to resolve things. The court went on to say that it thought what was going on is that the parties "used the day-to-day stuff" that is not important to "pick at each other." The court expressed concern about how the parties' "unresolved emotional differences" were affecting the children. The district court stated that it had reviewed the guardian ad litem's report and that it was "a good one."

The guardian ad litem's report, dated June 27, 2017, recommended that the 60/40 split of parenting time should be maintained without changing legal or physical custody, and that a specific parenting time schedule should be provided. The report expressed concern about either parent having full custody. The report stated that "each child is choosing a parent to support," and that while both parents are trying to be good parents, "neither parent is able to step back and put the children's needs first before his or her own opinions and needs." For example, "Heather's attitude about Natalie's refusal to go with her father for visits encourages Natalie's behavior by default, even if that is not Heather's intent." Scott's control of financial issues "exacerbates the power struggle" between them, "even if that is not Scott's intent." Sadly, "Silas and Natalie have heard both parents disparage the other. All of this affects Natalie and Silas." The report suggests, "In order to repair the alienation of the relationship between Scott and Natalie, Scott and Natalie must have uninterrupted time together that is not subject to any member of the family's discretion." Further, "[b]ecause of the conflict between the parents, I believe a schedule that reduces as much as possible the contact between the parents would be best for the children." The guardian ad litem also recommended family counseling, and handling the sharing of bills without Heather having to be in the middle.

Based on the record before us, we cannot say the district court abused its discretion in maintaining the joint custody arrangement. Despite the transition issues with Natalie, both parties agreed the children were doing very well in school. The district court modified the decree to eliminate parenting time transitions with both parents present, and the court set forth a more definite parenting time schedule to eliminate the need for any agreements between the parties regarding when parenting time would take place. The court also made it clear that the children were not permitted to decide if they wished to spend time with a parent, and neither parent was to solicit their input. While it is unfortunate that the parties have allowed their grievances with each other to affect their communication with each other and to adversely impact their children's attitudes towards them, the district court adequately addressed these concerns by ordering counseling for the family. While the parties definitely need to figure out a way to communicate better and work together to positively coparent their children, the district court did not abuse its

discretion by addressing these concerns without changing the custodial arrangement. As we have previously stated, even when the evidence demonstrates a lack of communication or cooperation between parents, appellate courts have declined to reverse trial court decisions where joint custody has been awarded or maintained. See *State on behalf of Maddox S. v. Matthew E.*, 23 Neb. App. 500, 873 N.W.2d 208 (2016).

CHILD SUPPORT AND OTHER COSTS

Heather sought a modification of child support, which the district court denied. The child support worksheet incorporated into the March 2015 decree attributed gross monthly income of $3,000 to Heather (or $36,000 per year), and $46,000 to Scott (or $552,000 per year). Scott was ordered to pay $2,500 per month in child support. Heather also claimed Scott did not pay his share of daycare or medical bills in a timely fashion. And although Scott initially resisted paying for the children's private school since Heather had not moved to Colorado as anticipated, Heather acknowledged at trial that Scott did subsequently equally split the children's private school costs with her.

It is well settled that a party seeking to modify a child support order must show a material change in circumstances which (1) occurred subsequent to the entry of the original decree or previous modification and (2) was not contemplated when the decree was entered. *State on behalf of Fernando L. v. Rogelio L.*, 299 Neb. 329, 907 N.W.2d 920 (2018). Among the factors to be considered in determining whether a material change of circumstances has occurred are changes in the financial position of the parent obligated to pay support, the needs of the children for whom support is paid, good or bad faith motive of the obligated parent in sustaining a reduction in income, and whether the change is temporary or permanent. *Fetherkile v. Fetherkile*, 299 Neb. 76, 907 N.W.2d 275 (2018). If applicable, earning capacity may be considered in lieu of a parent's actual, present income and may include factors such as work history, education, occupational skills, and job opportunities. *Id*. But, the paramount concern in child support cases, whether in the original proceeding or subsequent modification, remains the best interests of the child. *Id*.

Heather alleged in her complaint to modify that she was not earning as much as she had expected and that Scott's income had increased. At trial, Heather testified that she was working as a radiology technologist on an "as needed" basis, and she claimed there was no full-time employment for her "[a]round here." She earns $19.40 per hour (at 40 hours per week, this is equivalent to approximately $3,362 per month, or $40,344 per year). She testified that she earned approximately $2,000 per month in 2016 and anticipated it would be a little less than that in 2017.

Scott is a dentist. At trial, a certified public accountant (CPA) who had been "dealing with Dr. Beck's stuff for probably about seven years," prepared Scott's personal federal and state tax returns, as well as his dental practice returns. The CPA testified that Scott was originally a sole practitioner, but he subsequently hired another dentist, and in 2016, Scott sold half his interest in the dental practice and half his interest in the practice building (built in 2015) to the other dentist. The income for each dentist is prorated based on each doctor's production. Based on 2016 financial information, the change in the new ownership structure, and based upon financials through April 2017, the CPA estimated that Scott's salary for 2017 would be $265,000. The CPA was aware that at the time of the initial decree, Scott was attributed $46,000 per month of gross income. He did not anticipate Scott being able to get back to that amount; the decrease being "in large part due to

the sale of half of his practice," which meant "giving away 50 percent of the profits from the hygiene department." According to the CPA, the sale of the practice was not to make more money, but was "to take the load off of Dr. Beck and give him some free time and kind of a transition plan." (We note, however, that Scott testified he was not working any less.) According to the CPA, and Scott agreed, the sale was also to help pay off a loan Scott took on the building to fund the money judgment ($400,000) from the divorce settlement.

Scott testified that he was not asking to reduce his child support even though it was unlikely he would meet the $46,000 per month threshold previously attributed to him and which the CPA had discussed.

Heather argues on appeal that the reason for the initial deviation in child support (her moving to Colorado) did not take place, and due to Scott's current earning capacity, Scott's child support obligation should have been modified. She claims his 2015 income should be used (prior to the sale of one half his practice and practice building), plus the depreciation from his rental properties should be added back in, and that too much credit was being allowed for Scott's retirement contributions. Based on Heather's calculations using 2015 financial information, she claims Scott's income should reflect $55,785 in gross income per month (or $669,420 per year). We note that Heather claims Scott's business income in 2015 was $620,867, and she claims there are depreciation amounts which should be added to that amount; however, according to the 2015 tax return, Scott's business income was actually $498,441. The $620,867 figure relied upon by Heather includes a capital gain of $94,144 from the sale of business property (although the pertinent Form 4797 is not included), income of $21,338 from real estate interests, a capital gain of $416, and dividends and taxable interest of $6,528. The total of all these sources of income equals $620,867; Scott's business income comprised $498,441 of that. In 2014, Scott's business income was $660,958, and in 2016, it was $372,672.

As noted by Scott, he is working as many hours now as he was prior to the divorce and he sold a 50-percent interest in his business and building because he had an opportunity to bring on a partner and he had more patients than he could handle. He used the money from the sale "to pay off a mortgage he took out to pay the property judgment from the divorce." Brief for appellee at 23. Scott asserts he has not voluntarily reduced his income; the only change is in his business structure, "which provides greater stability in the long run." *Id*. Scott contends he provided evidence of his actual and current earnings, and that he is "working at full capacity." *Id*. at 24. Scott contends he produced all of his income information and had an expert witness testify, all of which Heather failed to rebut.

Based on the tax returns and other evidence produced by Scott at trial, including the testimony provided by the CPA, we cannot say that the district court abused its discretion by not modifying child support to reflect a change in income for either party. The amount of child support previously awarded was based upon Heather earning $3,000 gross per month and Scott earning $46,000 gross per month. While Heather testified she was earning less, the evidence also indicated she was not working full time. Furthermore, while she claimed she was unable to secure full time work as a radiology technologist, she did not provide persuasive evidence as to why she could not supplement her working hours with other employment. And although Scott produced evidence of a decrease in his income, he did not seek a reduction in child support and did not cross-appeal on this issue.

With regard to daycare and medical bills, the only modification made by the district court with regard to these matters was that the daycare provider (Heather's mother) was to bill Scott directly for his 80-percent share and Heather for her 20-percent share.

Scott explained that the "bills have come via text" (Heather took pictures of the bills and sent them by text) and he would lose track of them because they are not "paper bills" which he said were easier for him to track. To resolve the problem, Scott testified that he was willing to have the medical providers directly send him the bills and that he would pay all of the out-of-pocket "traditional medical, dental" expenses. He was also willing to have Heather's mother bill him directly for all her time taking care of the children.

Heather claims it was an abuse of discretion for the district court to not order Scott to pay 100 percent of these costs, as well as the first $10,000 of private education costs, since Scott agreed to do so. We find no abuse of discretion in the court deciding to only modify the manner in which the daycare costs would be billed, providing for such costs to be directly billed to Scott and Heather in their obligated percentages. Just because Scott was willing to pay for additional costs does not mean the district court was required to modify the decree to accommodate that offer. Nor does the absence of a directive from the court prevent Scott from voluntarily making good on his offer if he so chooses.

SCOTT'S ADDITIONAL PARENTING TIME

Heather argues that there "was no material change in circumstances justifying an extension of [Scott's] parenting time." Brief for appellant at 19. She claims Scott did not put on any evidence as to why any extra time was needed or "what change had occurred necessitating a change in parenting time." *Id*. at 20. She asserts that since Scott "was not requesting additional parenting time, and there had been no material change in circumstances affecting the best interest of the children, the court's order granting additional parenting time should be reversed." *Id*.

The best interests of the children are the primary and paramount considerations in determining and modifying parenting time. See *Fine v. Fine*, 261 Neb. 836, 626 N.W.2d 526 (2001). The right of parenting time is subject to continuous review by the court, and a party may seek modification of a parenting time order on the grounds that there has been a material change in circumstances. See *Smith-Helstrom v. Yonker*, 253 Neb. 189, 569 N.W.2d 243 (1997).

As already noted, the district court did find that there had been a change in circumstances, and proceeded to modify the parenting time schedule in addition to other matters already discussed. The evidence supports this decision. Scott and Heather had agreed at the time of their divorce that Scott should have parenting time with the children approximately 40 percent of the time. Under the alternating Thursday to Tuesday schedule in the modification order, Scott would have the children 5 days out of every 14-day period. This amounts to about 36 percent of the time. The district court did not increase Scott's parenting time; rather, it provided a schedule that would give Scott close to 40 percent of the parenting time while also minimizing transitions and eliminating direct contact between the parties during those transitions. Based upon the evidence already discussed above, we cannot say the district court abused its discretion by modifying the parenting time schedule in this manner.

CONCLUSION

For the reasons set forth above, we affirm the district court's December 3, 2017, order modifying the parties' March 2015 marriage dissolution decree.

AFFIRMED.